MELVIN E. HOWELL *v.* MARY O. HOWELL.

[No. 40, January Term, 1934.]

*Decided April 6th, 1934.*

532

The cause was argued before Bond, C. J., Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*Laurie H. Riggs,* for the appellant.

*Hartwell M. King* and *Daniel D. King,* for the appellee.

Adkins, J., delivered the opinion of the Court.

The bill of complaint filed in this case by appellee on April 20th, 1933, alleged the marriage of the plaintiff and defendant on January 18th, 1930, in Richmond, Virginia; that the parties are residents of Baltimore; that they have one child; that the conduct of plaintiff has been proper; that the defendant on or about March 4th, 1933, deserted and abandoned the plaintiff without just cause, and has since refused to live with her or to permit her and their infant child to live with him; that the plaintiff is without means of support for herself and child; and that the defendant has an income of about fifty-three dollars per week. The prayer of the bill is (a) for permanent alimony; (b) for alimony *pendente lite,* counsel fees and expenses of suit. The answer admits the marriage and residence; denies that defendant is the father of the child; avers that the child was born out of wedlock, and conceived at a time when it was impossible for defendant to have had access to the plaintiff; that, at the time of the conception of said child, the plaintiff was the wife of another man; that plaintiff falsely represented herself to defendant as a single woman, and stated in her application for the marriage license that she was a single woman, and not a divorced woman; that defendant has only recently learned that plaintiff was married to another man

at the time of the conception of said child, by whom she had another child, now dead, and from whom, defendant is advised, plaintiff was divorced prior to her marriage to defendant; defendant denies that plaintiff was always kind and faithful to him or that he abandoned her without cause and refused to live with her and the child, but asserts that she abandoned and deserted him; defendant further avers that he has for some time been employed by the Consolidated Gas, Electric Light & Power Company of Baltimore; that in August, 1930, while in the performance of his duty as such employee, he met with an accident, with the result that he lost his right arm and left leg; that since that time he has required the assistance of his wife in dressing and in eating; that he purchased and furnished a house in Baltimore as a home for himself and family; that in January, 1933, the plaintiff, while on a trip to Richmond with defendant, without any reason whatsoever, fired five shots from a revolver at defendant, declaring her intention of killing him, and thereafter willfully deserted him, taking with her said child, and going to the State of North Carolina, where she remained for six weeks, and then returned to Baltimore with the avowed purpose of obtaining defendant's money, and, failing, had him summoned to the Criminal Court of Baltimore City; that after said desertion by his wife he returned to his home, and continued to live alone in his helpless condition until he was convinced that plaintiff would not return, when he disposed of said house, stored his furniture, and went to a boarding house to live where he could secure the assistance he needed; that since plaintiff's return to Baltimore defendant has invited her to come back and live with him, which she refused to do unless he would purchase new furniture and household furnishings in place of those in storage; that throughout the period of separation defendant has each week sent plaintiff five dollars for the support and maintenance of her child. He admits that he has an income of fifty-three dollars per week, which includes eighteen dollars a week compensation for his injury, but avers that because of

his helpless condition it is necessary for him to pay for assistance rendered him in addition to the amount he pays for board and lodging.

On May 23rd, 1933, defendant filed a cross-bill alleging that his wife was guilty of adultery with one Vincent Chiaramonte, "and with divers other persons whose names to your orator are at this time unknown," and prays for an absolute divorce. On May 25th, 1933, plaintiff answered denying the charge of adultery; admitting that no children were born after her marriage, but averring that one child was born to them prior, to their marriage, the parenthood of which he has never before denied, and which child he has always acknowledged as his own. The answer further avers that while the cross-plaintiff has refused to live with her since she returned from her home in North Carolina in March, he has on various occasions cohabited with her.

The abandonment of the wife (the plaintiff), by her husband, we think is satisfactorily established. Whoever may have been in fault in the separation from January 14th, 1933, to March 4th, 1933, during which time she was at the home of her father in North Carolina, we think it is abundantly proved that, on her return to Baltimore, she sought reconciliation with her husband and was anxious to return to him, and that he persistently declined to reconsider, although it seems to be reasonably clear from the testimony that he had sexual intercourse with her on several occasions while they were living apart. The defendant contends that her offer to return was conditional upon his buying new furniture, but this is denied by the wife, who testified she would be glad to live with him if he would treat her right. Several other witnesses testified to her efforts at reconciliation, including the general manager of the gas and electric company, defendant's employer. This witness, Kenneth M. Jones, testified that while plaintiff was in North Carolina a telegram came to the office from her addressed to defendant, which witness read by mistake, in which she was appealing to her husband to send her money to bring the baby back home. "I went to

see him and I told him I thought he was treating his wife a little bit shady and he should support the child and send her the money to come back here on"; that some days later she came to the office. "She said, 'Mr. Jones, my husband would not send me money to come home on and my father has given me the money and I want you to see if you can't persuade him to take care of me and the child.' She said 'Don't do anything that would cause him to lose his job.' * * * I arranged with Mr. Howell and Mrs. Howell to come to the office, and I told Howell to go back with his wife, and he said, 'No, under no conditions would he live with her.' He said, 'No, you go to North Carolina and I will send you about five dollars a week.' This happened two months ago."

The testimony of defendant and his brother Clyde, as to the firing of a revolver by the plaintiff on the visit to Richmond just before she went to North Carolina, is not convincing. Plaintiff denies that any shots were fired. Her version of the occurrence is that she "was so upset because he (her husband) had told her he was going to send me away and he did not want to live with me any more, and I really loved him and I still love him, and I knew he had a gun in the machine, so I said, 'all right, if you don't want me, I will end it all,' and I just wanted to see if he really cared for me and wanted to take me back." "Q. You made believe you were going to shoot yourself. A. Yes, sir; I didn't say anything about shooting him. Q. Did he take the gun away. A. No, he did not take the gun away, he said, 'well, give me the gun,' so I handed him the gun." Another witness testified as to a conversation she had with defendant two weeks after the incident. "He came to my house and was talking about having such trouble getting rid of her, and he said in his brother's home in Richmond she came in the house with a gun. I says, 'Did she shoot at you'. He said, 'Hell, no, I and Clyde threw her down and taken the gun away from her', * * * he did not say she threatened him. He just said she went out and came in with the gun."

It does not appear from the record that in the conversation with Mr. Jones, in which defendant said he would not live with his wife, this alleged shooting incident was mentioned, or any fear of her intimated. And defendant's testimony that "I am scared to live with her," is not consistent with his testimony that he wanted her to return to him. Indeed his testimony as to this incident sounds unreal. Nothing like that ever occurred before, and there is no evidence that she had ever been violent or ill tempered, and according to his story there was nothing to incite her to anger on that occasion. He drove her and the baby to Richmond to visit his mother, who lives with his brother. They arrived there about 8 p. m. and called up his brother. "He asked me to go to the plant, I said, 'I will go with you for an hour or so', or something like that. She told me, she said, 'you aren't leaving this house tonight,' I said, 'I am leaving here, I am going to the plant with my brother.' She said, 'If you leave here tonight I will kill you'. I thought she was joking. I said, 'I am going to the plant with him tonight.' So he and I started to get our coats and hats to go out. I was in the living room, and I told my brother to go right out, and I did not pay any attention, but she went out the door. She went to the car and my brother went to the door. * * * She came in the door and just as she came in the door, she said, 'You ———, I am going to kill you,' and she started shooting at me." He further testified that his brother took the pistol away from her; that she said she was going home to stay; that he gave her money to pay her fare on the next train to her father's home in North Carolina. He does not give the slightest hint of anything occurring in the course of the drive to stir up such an outburst. The wife's story is much more consistent with all that preceded and followed the occurrence.

If the wife was at fault in leaving her husband for so long a time, yet if she repented and offered in good faith to return, and her offer was refused, this constituted desertion by the husband. *McClees v. McClees*, 162 Md. 70, 158 A. 349, and authorities there cited.

We think the weight of the evidence is in her favor and that she is entitled to separate maintenance, unless she has been guilty of adultery, as charged in the cross-bill.

To sustain this charge the defendant produced four witnesses, all of whom swore they had had sexual intercourse with the plaintiff. Two of them had been convicted of burglary. The co-respondent named in the cross-bill, Vincent Chiaramonte, was summoned to testify for defendant, and was said by defendant to have been in the court all the morning, but to have disappeared before he was called to testify. Apparently no one was able to find him, although an attachment was issued for him by the chancellor. Asked what he knew about anybody committing adultery with his wife, the defendant said: "Well a friend of mine—we were down in a saloon by the Belair Market, and he and I were drinking some beer, and this fellow was sitting at the table we were sitting at too and the fellow heard us talking about my wife suing me for divorce. I said my wife was suing me for support and all, and this friend of mine called me Howell, and this other fellow says, 'Is your name Howell?' I said, 'Yes, my name is Howell.' He said, 'Do you live at 2712 Kildaire Drive?' I said, 'Yes, I don't live there now.' He said, 'Is your wife's name Mary Howell?' I said, 'Yes, her name is Mary.' He said, 'Do you know your wife is running around?' I said, 'Well, I thought so, but I never could see it.' He said, 'Well, I have been out with your wife.' I said, 'Did you ever have intercourse with her?' He said, 'Yes, I have had intercourse with her on two occasions.' I said, 'How do you know it is her?' He said, 'Well, she lived at 2712 Kildaire Drive,' and he described the woman." That defendant the next day took this man in his car to the house where his wife was boarding to look her over, and she spoke to him when she came out to the car. It may be noted in passing that the defendant failed to produce or to disclose the name of the alleged friend who, he said, heard the conversation above detailed. The chancellor frankly did not believe this story.

The taking of testimony was postponed from time to time,

and in one of the intermissions defendant was favored with another rather remarkable coincidence some time during the week preceding thet resumption of testimony. Until this happened the defendant was absolutely without evidence to support his cross-bill, the co-respondent named in the bill having failed him. As a result of this coincidence, defendant belatedly produced two witnesses, John E. Teal, Jr., and George McCoy. Both of them, a few months before the occurrences to which they testified, had completed terms of one and two years respectively in the Maryland House of Correction for burglary.

Teal's story was that about eight days before Christmas of 1932, he picked up plaintiff, whom he did not know, took her to a shore resort of doubtful character, had drinks with her, and they retired to a bedroom where he had intercourse with her, and remained in bed with her from 7 o'clock in the evening until 1 or 2 o'clock the next morning, when he took her to her home on Kildaire Drive. That the first time he ever saw defendant was one day about a week before he testified, when defendant came over to the home of witness' father. In explanation of defendant coming to see him when witness had not told any one of his relations with plaintiff, he said that defendant got it from a friend of witness, a barber named Tony, whom witness told at Tony's shop on Greenmount Avenue near Preston Street a week or so before the trial. That the reason he told Tony was that Tony asked him if he knew a girl named Mary. Witness said he did not know whether he did or not, and Tony took him out an hour later and pointed her out on the street. That after witness was summoned in the case he went with defendant to see the barber. It was proved by the barber who owned the shop on Greenmount Avenue near Preston Street that he had owned it for nine months; that Tony owned it before that but had not been there since July, 1932; that he, witness, did not know Teal and never saw him in the shop. Howell does not corroborate Teal. McCoy testified that he saw plaintiff with Teal at the shore place one night, and saw her go into a bedroom with him, and that they remained in the room until

about 1 o'clock. Another witness discovered by defendant on the eve of his testifying was John T. Hays, Jr., who said he had intercourse with plaintiff ten or twelve times during June and July, 1932; and at a subsequent sitting of the court, Martin R. Hays, the brother of John, was produced, who testified that he also was having intercourse with plaintiff frequently during the same months, both day and night.

The chancellor discredited the testimony of all these witnesses on the denial by plaintiff of the truth of their statements. The defendant's whole case was rendered suspect by the character of some of his witnesses, the method of their procurement, and the sort of testimony all of them gave, and its inherent improbability. A number of apparently reputable witnesses testified as to the good character and reputation of the plaintiff. The chancellor had before him several witnesses who swore that defendant had offered them money to testify that they had had intercourse with his wife; and one of defendant's witnesses testified that defendant requested him to so testify, but he refused to do so, denying that any such thing had occurred. The defendant denied that he had offered any one money.

What has so often been said by us as to the better opportunity of the chancellor to weigh the credibility of witnesses who appear before him than an appellate court could have from a printed record, applies peculiarly to a case like this, where there has obviously been perjury on one side or the other. And we are not prepared to disturb his finding that the charge of adultery was not sustained.

The remaining questions are not concerned with the right of the appellee to separate maintenance; but with the allowance for the support and maintenance of the infant child.

The right to such allowance depends upon whether (1) the defendant has met the burden of proving that at the time of the conception of the child the appellee was the lawful wife of another man, with whom she was presumed to have marital relations; or if not, (2) the plaintiff has met the burden of proving that the defendant was the father of said infant child. It must be inferred from the fact that the chancellor

decreed an allowance for the support of the child that he answered the first question in the negative and the second in the affirmative.

As to the first, the defendant produced copies properly certified under the Act of Congress of a decree of divorce in favor of one Mary Bridges in a suit by her against one Earle Bridges in the Supreme Court of Harnett County, North Carolina, and of the sworn complaint in said case. In the complaint, filed September 7th, 1928, plaintiff alleges that she has been a resident of North Carolina for more than twenty years, all her life. The uncontradicted testimony of the plaintiff, her sister, and of her father, was that in 1933 she was twenty-three years old. She could not, then, have been more than eighteen in September, 1928, when the complaint was filed. The plaintiff in that case was more than twenty. The appellee and her father and sister testified that the appellee lived with her father prior to her marriage to Howell; that they did not know Earle Bridges; that she was never married to any one other than Howell; that they knew nothing of the divorce proceedings. Another resident of Erwin, where appellee lived with her father before her marriage to Howell, and who was paying attention to appellee and visited her once or twice a week during the years 1927 and 1928 (the complaint in the *Bridges* case alleged the marriage was on September 2nd, 1927) testified that so far as he knew appellee was not married at that time; that he never saw Earle Bridges; that he never heard it reported that appellee was married to Bridges.

Appellant produced two witnesses, one of whom, William Barbour, testified that he knew appellee when she was Mary Stewart; that he had seen Earle Bridges a few times at her father's; that she had told him she was married to Earle Bridges; that he was requested by her to attend court as her witness in a divorce suit against Bridges; that he attended but did not testify; that the appellee was the Mary Bridges he saw in court during the trial of the divorce case.

The other witness, W. T. Barefoot, said he knew appellee when she was Mary Stewart; that he had seen a man who

was said to be Earle Bridges once at her father's house when Mary was there; that Mary never told him she was married; that he had heard some people call her Mary Bridges; that the appellee was the same person whom he had heard called Mary Bridges; that she never told him she had a suit for divorce; that he was not at the trial; that he does not know she was married to Earle Bridges; that he had seen Howell at her father's and that he and Mary were recognized as sweethearts; that her character was good.

Of course, it is impossible to reconcile the testimony of Barbour with that of appellee and her witnesses. But he was probably not known to the chancellor. The testimony of Barefoot is not necessarily irreconcilable. The appellee testified she was engaged to a man named Earle Briggetts at the time she met Howell, and broke her engagement with Briggetts to marry Howell. It is possible that Barefoot may have heard a report that she was married to Briggetts, and that he may have seen Briggetts at her father's house.

On the testimony as above set out we would not feel justified in disturbing the conclusion reached by the chancellor. But there is a more compelling reason for supporting his conclusions that Earle Bridges was not the father of the child, even if appellee was the complainant in the North Carolina divorce proceedings.

In that case the complaint, sworn to on August 31st, 1928, charged the defendant with adultery, and the plaintiff obtained the divorce. The record does not show what the evidence was, but it must be presumed that the divorce would not have been granted if there had been intercourse between the husband and wife after the plaintiff knew of the adultery. That presumption, in the absence of proof to the contrary, is equivalent to proof of nonaccess after August 31st, 1928. The child was not born until July 14th, 1929, more than ten months after August 31st, 1928. It follows from the documentary evidence produced by defendant that Earle Bridges was not the father of the child.

As to the second question, on the supposed authority of *Scanlon v. Walshe,* 81 Md. 118, 31 A. 498, the chancellor

refused to admit some of the testimony proffered by plaintiff. But in that case there was no doubt about the access of the husband to the wife at the time of the conception and birth of the children, the alleged act of adultery, on which the bill in the divorce proceeding was based, not having occurred until after the birth of the children. In such circumstances it was held access was presumed, and neither the wife nor her alleged paramour could be permitted to testify to the fact of illegitimacy. In the present case, nonaccess and illegitimacy are proved by documentary evidence produced by the defendant, or at least the presumption of access is overcome.

However, the majority of the court hold that, notwithstanding the erroneous ruling against the plaintiff, there remains in the record enough to support the finding of the chancellor that the defendant was the father of the child.

*Decree affirmed, with costs.*

DIGGES, J., concurs in the result.