## HENRY ROBERTS et al. v. STATE.

No. A-4259.   Opinion Filed April 26, 1924.
(225 Pac. 553.)

(Syllabus.)

1. **Indictment and Information—For Lewdness Must Show Culpable Single Offense or One Continuous Offense.** An indictment or information based on a statute providing that "any person who willfully and wrongfully commits any act * * * which grossly disturbs the public peace or health, or which openly outrages public decency and is injurious to public morals * * * is guilty of a misdemeanor," must state facts definitely showing a culpable single offense, or one continuous offense.

2. **Same—Indictment Bad as Duplicitous.** An indictment is duplicitous under this statute where it charges that on the——day of May, 1921, Henry Roberts, a white man, and Nancy Jiles, a negro woman, did unlawfully, willfully, and wrongfully commit acts in the presence and among divers and sundry persons which did then and there greatly disturb the public peace and which did openly outrage public decency and injure public morals by lasciviously meeting and associating with one another in public and private; that they drove together publicly in a buggy; that Henry Roberts went to and remained at the home of Nancy Jiles both in the daytime and at night; that they ate together at the same table; and that they were guilty of living together in open and notorious adultery.

3. **Same—Indictment in Language of Statute Insufficient.** It is not sufficient to charge one offense under this statute in the words of the statute, where the particulars essential to constitute a complete offense are not explicit enough to acquaint the accused with what he must meet upon the trial.

**4.** **Lewdness—Instruction on Test of Criminality Erroneous.** An instruction to the jury that the common sense of the community, and the sense of decency, propriety, and morality which most people entertain in the community in which the acts were alleged to have been committed, was the test to apply to determine whether the acts charged and proved were a crime under this statute was prejudicially erroneous.

**5.** **Same—Construction of Statute—Laws to Operate Uniformly.** Laws against crime are intended to operate uniformly in every place within the territorial limits over which they extend. The true rule of interpretation of this statute is that any act which is so grossly immoral as to shock the sense of decency of self-respecting people as a whole, or any act manifestly indecent and repugnant to the usages and customs of civilized society, or any act which is unquestionably criminal, though not covered by any other criminal statute, is a violation of the law.

Appeal from County Court, Bryan County; John Finney, Judge.

Henry Roberts and another were convicted of outraging public decency and morality, and they appeal. Reversed and remanded for new trial.

W. E. Utterback, V. B. Hayes, J. T. McIntosh, and D. S. McDonald, for plaintiffs in error.

The Attorney General and J. Roy Orr, Asst. Atty. Gen., for the State.

BESSEY, J.  This is a conviction for outraging public decency. The defendants in the trial court, plaintiffs in error here, were found guilty on an indictment charging a violation of the provisions of section 2287, Compiled Statutes 1921, which reads as follows:

"Any person who willfully and wrongfully commits any act which grossly injures the person or property of another, or which grossly disturbs the public peace or health, or which openly outrages public decency and is injurious to public morals, although no punishment is expressly prescribed therefor by this chapter, is guilty of a misdemeanor."

At the trial both defendants were found guilty as charged, and each was sentenced to pay a fine of $250.

The indictment charged that on the—— day of May, 1921, Henry Roberts, a white man, and Nancy Jiles, a negro woman, did unlawfully, willfully and wrongfully commit acts in the presence of and among divers and sundry persons which did then and there greatly disturb the public peace and which did openly outrage public decency and injure public morals by lasciviously meeting and associating together in public and in private; that they drove together publicly in a buggy; that Henry Roberts went to and remained at the home of Nancy Jiles both in the daytime and at night; that they ate together at the same table; and that they were guilty of living together in open and notorious adultery.

The proof supporting the conviction was to the effect: That Henry Roberts was an elderly white man with several children, whose wife had died many years before. That after the death of his first wife he had married again and soon afterwards divorced his second wife. That Nancy Jiles was a negro woman of some means, and possessed of considerable real estate and live stock. That for years she had assisted Roberts in caring for his children and looking after his household cares and duties, and that he in turn assisted her in caring for her live stock and doing her chores. They lived in separate houses, not far apart, and often when Roberts was away from home Nancy stayed with his children during the night and on a few occasions had remained at Roberts' house over night when he was at home. For a time Roberts lived in one of Nancy's houses. Roberts borrowed money from Nancy to buy a telephone exchange, and they rode to Denison, Tex., together to consummate the deal. At and before the time this action was commenced Roberts lived with his family in the telephone exchange building. On one oc-

casion Roberts, Nancy, and the children went blackberry gathering together. Nancy would bring cooked food, cakes, and other dainty edibles to Roberts' home, and Roberts would carry uncooked provisions to Nancy's house and do her chores, sometimes milking the cows and feeding the chickens and taking some of the milk and eggs for his own use.

There was no evidence of lascivious or adulterous conduct between the parties except as stated by Roberts' grown daughter, who admitted that she had hostile and unfriendly feelings toward her father, who at one time chastised her for being out at night with some of her boy friends. She admitted that she had been adjudged a delinquent child by the juvenile court for improper relations with men, and that she was then an inmate of a reformatory institution for delinquent girls. She testified that on several occasions, without fixing any particular dates, her father went to Nancy Jiles' home in the nighttime, remaining there for several hours.

The incidents related by the different witnesses concerning the business and social relations of the defendants at different times and places covered a period of several years. No particular act or occurrence was proved or relied upon as a basis for the prosecution. No overt act was specifically proved as having taken place in May, 1921, as alleged in the information. The proof did tend to show that the offense, if indeed it was an offense, was a continuous one—an unnecessary habitual association between a white man and a negro woman.

In communities where white people and negroes reside, business relations between the races are inevitable, and just how far social relations should extend is a question concerning which good people entertain different ideas. Social equality between the races is of course unthinkable; such

equality would bring about the moral degradation of both races. But from the proof in this case we cannot say, as a matter of law, that the conduct of these two individuals, exclusive of that testified to by Roberts' daughter, so outraged public decency or was so injurious to public morals as to constitute a crime under the provisions or within the meaning of the act above quoted. Not every moral dereliction is a crime within the meaning and intended operation of this statute.

When a crime is alleged to have been committed in several different ways or by means of different methods, it may not be sufficient to charge the offense in the language of the statute. The state should charge and prove the particular act constituting the offense and the means and methods of committing it. The information should charge but one offense, though the means of committing it may be several. One accused of crime has a right to be confronted with a written accusation definitely apprising him of the identity and nature of the charge in such manner as will enable him to prepare his defense; and it is not sufficient to charge the offense in the words of the statute where the particulars essential to constitute a complete offense are not explicit enough to acquaint the accused with what he must meet upon the trial. Fletcher v. State, 2 Okla. Cr. 300, 101 Pac. 599, 23 L. R. A. (N. S.) 581; Porter v. State, 4 Okla. Cr. 654, 111 Pac. 1023; Simpson v. State, 5 Okla. Cr. 57, 113 Pac. 549; Cole v. State, 16 Okla. Cr. 103, 180 Pac. 713; 14 R. C. L. 187.

As we interpret it, this indictment charges several separate offenses. It charges that a white man and a negro woman outraged public decency by adulterous conduct; it charges that they outraged public decency by riding together publicly; it charges that they outraged public decency by visiting together and at one another's homes, both in the day and in the nighttime. These are separate offenses, not

means of committing one offense. One of these offenses, open and notorious adultery, is a crime over which the county court would have no jurisdiction in any event. The proof adduced by the state justifies the conclusion that these were separate offenses, because the different transactions offered in evidence were separate acts that occurred at various places and at times covering a period of years—some of them beyond the jurisdiction of the court. A single offense cannot be proved cumulatively by proving separate offenses, each a part of the whole offense sought to be made out.

The information in this case is duplicitous. Under the accusation and proof some of the jurors may have concluded that the defendants were guilty because they ate at the same table; others may have concluded they were guilty because they sustained adulterous relations with one another; others may have found they outraged public decency by picking blackberries together—various ones finding them guilty for different reasons without any concurrence of all the jurors on any one of the offenses—in effect, a verdict of guilty on general principles. For this reason the demurrer to the information should have been sustained.

Another grievous error appears in the record. The court instructed the jury that the common sense of the community and the sense of decency, propriety, and morality which most people entertain in the community in which the acts were alleged to have been committed was the test to apply to this statute. The assistant attorney general, in his brief, concurs in this view, stating that acts which might disturb the public peace, be injurious to public morals, and outrage public decency in one community might not disturb another community; that public morals and ideals might be different in one section of the country from those in another section; that it is the purpose of this law to protect the various commun-

ities of the state from any act which will grossly disturb the public peace or public morals, or outrage the public decency of the community disturbed; and that the statute might apply and was intended to apply differently in different communities.

With this plastic, uncertain application of the statute, by which it might be made to apply differently in different communities, we cannot agree. Such a construction was not intended by the declaration of this court in the case of Fessler v. State, 12 Okla. Cr. 579, 160 Pac. 1129, which involved a notorious lascivious act of a married man with an unmarried girl; or the case of State v. Lawrence, 9 Okla. Cr. 16, 130 Pac. 508, a case relating to gambling in a public place. Both of those cases involved single, separate offenses, as distinguished from a state of continuous conduct as seems to have been the theory of the state in this case.

Be that as it may, laws against crime are intended to operate uniformly in every place within the territorial limits over which they extend. To hold that a penal law may or may not operate as such in a particular community, dependent upon public sentiment in that community, would in its last analysis amount to the antithesis of law and result in a kind of anarchy where every community might establish its own penal regulations. The true rule of interpretation of this statute should be and is that any act which is so grossly immoral as to shock the sense of decency of self-respecting people as a whole, or any act manifestly indecent and repugnant to the usages and customs of civilized society, or any act which is unquestionably criminal, though not covered by any other criminal statute, is a violation of the act, independent of what the people of any particular community may think about it.

For the reasons stated, the judgment of the trial court is reversed, and the cause remanded for a new trial.

MATSON, P. J., and DOYLE, J., concur.