[Crim. No. 11822. Second Dist., Div. Three. June 3, 1966.]

In re JEANNE DAVIS et al., on Habeas Corpus.

Stanley Fleishman for Petitioners.

Kurlander, Shettler & Solomon and Stephen Warren Solomon as Amici Curiae on Behalf of Petitioners.

A. B. Keel, City Attorney, for Respondent.

Roger Arnebergh, City Attorney (Los Angeles), Philip E. Grey, Assistant City Attorney, and Allen U. Schwartz, Deputy City Attorney, as Amici Curiae on behalf of Respondent.

KAUS, J.—Petitioners Jeanne Davis and Harlan Clay Davis, husband and wife, were each convicted in the municipal court of violating that portion of section 650½ of the Penal Code which makes it a misdemeanor "wilfully and wrongfully" to commit any act "which openly outrages public decency," provided that no other punishment for such act is prescribed by the Penal Code.

In the same trial Jeanne Davis was acquitted of a charge of violating section 314, subdivision 1, of the Penal Code; a charge of violating section 314, subdivision 2, of the Penal Code against Harlan was dismissed in furtherance of justice.[1] The judgments were then appealed to the appellate department of the superior court which affirmed by written opinion. At the request of petitioners and of the District Attorney of the County of Los Angeles[2] a rehearing was granted. After rehearing the judgments were again affirmed. The appellate department, proceeding under California Rules of Court, rule 63, certified the case to this court, petitioners having applied

---

[1]Section 314 of the Penal Code reads in part as follows: "Every person who willfully and lewdly, either 1. Exposes his person, or the private parts thereof, in any public place, or in any place where there are present other persons to be offended or annoyed thereby; or 2. Procures, counsels, or assists any person so to expose himself or take part in any model artist exhibition, or to make any other exhibition of himself to public view, or the view of any number of persons, such as is offensive to decency, or is adapted to excite to vicious or lewd thought or acts, is guilty of a misdemeanor."

[2]The district attorney did not urge any particular result, but merely pointed out that the appellate department's opinion, as then written, raised certain troublesome questions for law enforcement and requested clarification.

for such a certification. We denied transfer. (Cal. Rules of Court, rule 62(a).)

Mr. and Mrs. Davis then petitioned the Supreme Court for a writ of habeas corpus asserting that section 650½ of the Penal Code was unconstitutional. That court entered an order directed to the Chief of Police of the City of Hawthorne, ordering him to show cause before this court why the relief prayed for should not be granted. In his return the respondent chief of police does not question the propriety of the writ as a means of testing the constitutionality of the statute.

The incident out of which the charges against petitioners grew occurred on June 26, 1964, at a bar operated by them. The facts are not in dispute. We quote from the trial judge's memorandum:

"On June 26, 1964, in the city of Hawthorne, County of Los Angeles, State of California, at a restaurant and bar called the Golden Nugget, the defendants held a fashion show, starting at about 7:30 p.m.

"About 150 people were in attendance. They all had been invited by Mr. Davis. Three girls modeled lingerie, baby dolls and swim suits.

"Mr. Davis then announced that it was time to model the topless bathing suit, and that if anyone would feel offended by the female form, to leave 'or forever hold your peace.'

"Mrs. Davis walked to a stage about one foot high and ten feet square. The spectators were standing around the stage. She was clad in a knee length leopard skin dress. She unfastened it and handed it to Mr. Davis. She was then clad solely in the bottom portion of a bikini, also leopard skin, supplemented by two slender leopard skin ribbons. Her breasts were bare . . .

"She remained that way between a half minute and a minute. She was facing the bar at first, then turned toward a policeman she knew was in attendance with a camera, then turned toward the bar. The policeman took the photographs constituting People's Exhibits 1 through 5, in evidence.

"She did not shake or jump while modelling.

"Afterwards Mr. Davis asked the policeman if an arrest would be made. The policeman said none would be made at that time. Mr. Davis said that he knew six people who would sign a complaint and if no complaint were filed it would cost them $6,000,000.00 in publicity, because several national magazines were waiting for a complaint to be filed.

"Defendant's Exhibits A through D are magazines purchased in a liquor store in the city of Hawthorne. They were

received in evidence, as defense counsel stated 'for the purpose of establishing contemporary standards in attempting to define the words 'lewdness' and 'indecent exposure'.'

"Character witnesses testified that the reputations of the defendants for morality and decency are good. The defendants did not testify."

The magazines referred to are devoted in large part to photographs of nude women, wearing considerably less than Mrs. Davis did on the occasion in question.

The trial judge's memorandum, in which he explained the basis of his decision, also contains the following: "In this count [Penal Code, section 650½] the defendants are charged with outraging public decency.

"The word 'decency' is defined as 'freedom from obscenity or indecorum; modesty.' The word 'decorum' applies especially to that which is decent or becoming in manners or conduct; it frequently implies little more than the absence of all that is unseemly."

This language, though not quite free from doubt, strongly implies that the trial court gave the broadest possible definition to the word "decency," equating it with "decorum" and "seemliness." We mention this, not to indicate that such a construction is erroneous, but merely to show that it is one which is reasonably possible.

Before proceeding to discuss the merits of petitioners' claims, it seems proper—in spite of respondent's concession—to explain why we think that habeas corpus is an appropriate remedy. At first blush one might suppose that the principles expressed in *In re Sterling*, 63 Cal.2d 486 [47 Cal.Rptr. 205, 407 P.2d 5] preclude petitioners from attacking a final judgment in such a proceeding as this. A closer reading of *Sterling*, however, convinces us that the rule of that case is confined to situations where the asserted violation of constitutional rights has no bearing on the question of guilt. *Sterling* involved the use of allegedly illegally seized evidence. Such evidence, though inadmissible if obtained in violation of the Fourth Amendment, usually removes any lingering doubt that an innocent person has been convicted. The constitutional attack in the present case, on the other hand, goes to the very heart of the People's case against petitioners, that is to say, the validity of the statute[3] under which they were convicted.

---

[3]Wherever in this opinion we refer to "the statute" or "section 650½," we refer only to that portion of the section under attack, unless the context of the discussion indicates otherwise.

*Sterling,* therefore, is no obstacle to the review petitioners seek, for which there is otherwise ample precedent. (*In re Jackson,* 61 Cal.2d 500, 503 [39 Cal.Rptr. 220, 393 P.2d 420]; *In re Dixon,* 41 Cal.2d 756, 762 [264 P.2d 513]; *In re Bell,* 19 Cal.2d 488, 492-495 [122 P.2d 22].)

The main thrust of the attack on the portion of section 650½ of the Penal Code involved here is the claim that the statute is unconstitutionally vague.

As has been pointed out by many writers,[4] the vagueness of a statute may lead to a judicial inability to enforce it, regardless of constitutional considerations. The Roman maxim *"ibi jus uncertum, ibi jus nullum"* is considerably older than the Fourteenth Amendment. For obvious reasons, however, attacks on statutes on the basis of vagueness are generally made on constitutional grounds. The additional remedies—such as the present proceeding—afforded by reliance on the Constitution point up the wisdom of such a course.

█ The classic formulation of the test for unconstitutional vagueness is that of Justice Sutherland in *Connally* v. *General Constr. Co.,* 269 U.S. 385, 391 [46 S.Ct. 126, 70 L.Ed. 322]: "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. █ And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."

It is, of course, not surprising that the practical application of this test in concrete cases has not always resulted in unanimous opinions. Thus in *Winters* v. *New York,* 333 U.S. 507 [68 S.Ct. 665, 92 L.Ed. 840], the Supreme Court divided six to three on the constitutionality of the New York statute involved, and in our own state, to cite a fairly recent example, our Supreme Court was far from unanimous in holding that the term "loiter" was sufficiently definite. (*In re Cregler,* 56 Cal.2d 308 [14 Cal.Rptr. 289, 363 P.2d 305].) As one learned writer on the subject has observed: "There is no sharp line

---

[4]See for example Amsterdam, *The Void-for-Vagueness Doctrine in the Supreme Court* (1960) 109 U.Pa.L.Rev. 67; Collings, *Unconstitutional Uncertainty—An Appraisal* (1955) 40 Cornell L.Q. 195; Comment (1954) 53 Mich. L.Rev. 264; Note (1948) 62 Harv. L.Rev. 77.

between language which is certain and language which is uncertain. What is uncertain at one time may be certain at another. What is uncertain to one justice may be certain to another. What is uncertain to one justice in the civil liberties area may be certain to the same justice in the economic sphere."[5]

It goes without saying that "All presumptions and intendments favor the validity of a statute and mere doubt does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears." (*Lockheed Aircraft Corp.* v. *Superior Court*, 28 Cal.2d 481, 484 [171 P.2d 21, 166 A.L.R. 701].) Further " 'Reasonable certainty, in view of the conditions, is all that is required, and liberal effect is always to be given to the legislative intent when possible.' " (*People* v. *Hallner*, 43 Cal.2d 715, 720 [277 P.2d 393].) Also, "It is not required that a statute, to be valid, have that degree of exactness which inheres in a mathematical theorem. It is not necessary that a statute furnish detailed plans and specifications of the acts or conduct prohibited." (*Kelly* v. *Mahoney*, 185 Cal.App.2d 799, 803-804 [8 Cal.Rptr. 521].)

We approach the subject statute with these principles in mind. That it poses problems cannot be doubted—the question is whether they can be solved.

First and foremost—and in view of the conclusion that we have reached we need go no further—there is the problem of what is meant by "public decency." Does the word "decency" refer merely to bad manners or to immoral conduct or, more specifically, to immoral conduct with overtones of sex, eroticism or nudity? Does the term "an act . . . which openly outrages public decency" refer to conduct decent and moral when done in private, but not when in public; or conduct indecent or immoral, or both, even if private, which outrages the "public", whether done in private[6] or public? Finally,

---

[5] Collings, *Unconstitutional Uncertainty—An Appraisal* (1955) 40 Cornell L.Q. 195.

[6] This particular problem appears to have been laid to rest by cases such as *People* v. *Stevens*, 190 Misc. 441 [74 N.Y. S.2d 346]; *People* ex rel. *Radaha* v. *Mock*, 69 N.Y.S.2d 725; *Gunn* v. *Territory*, 19 Okla. 240 [91 P. 861]; *State* v. *Lawrence*, 9 Okla.Crim. 16 [130 P. 508]; *Rachel* v. *State*, 71 Okla. Crim. 33 [107 P.2d 813] and *State* v. *Stevens*, 33 N.D. 540 [15 N.W. 668], holding, in effect, that private misconduct is not done "openly" as required by New York and Oklahoma statutes similar to section 650½.

even if we decide which attitude of the public, the moral or the decorous, is the one which must be outraged, there is the question "who is the public"? Do 12 jurors automatically represent it? That answer is a great deal easier to give in a homogeneous society, in times of well established precepts of morality and manners, such as Victorian England, than today. Our American—and more particularly, our Californian—society, on the other hand, is highly heterogeneous in religion, race, social background and national origin, a fact which gives little assurance that the collective judgment of one jury will, in all but the most extreme cases, be anything like that of another.[7] When the statute speaks of "public decency" does it presuppose some kind of consensus among the majority of the public as to what is and what is not "decent" and, if that assumption is wrong, to which segment of the public is the trier to look?

The above are not all the possible permutations of the uncertainties lurking in the statute, but they are sufficient to set the stage for our discussion.

■ As already noted, the mere fact that different interpretations of the statute are possible does not make it unconstitutional. ■ Just as we are bound by the standard of vagueness laid down by the United States Supreme Court, so we are told by the same court that "the law is full of instances where a man's fate depends on his estimating

---

[7]That the United States Supreme Court looks with disfavor on definitions of crimes which would leave it to the moral judgment of juries to determine whether or not a crime has, in fact, been committed is demonstrated by *Musser* v. *Utah*, 333 U.S. 95 [68 S.Ct. 397, 92 L.Ed. 562]. In that case the defendants had been convicted under a statute which made it illegal to conspire "to commit acts injurious to public morals. . . ." The Supreme Court remanded the case to the Utah Supreme Court, in order to give that court an opportunity to determine what the statute meant. In doing so, it said: "Standing by itself, it would seem to be warrant for conviction for agreement to do almost any act which a judge and jury might find at the moment contrary to his or its notions of what was good for health, morals, trade, commerce, justice or order." (While the statute permitted punishment for conspiracy to commit acts injurious to public health, morals, trade, commerce, etc., the information in *Musser* v. *Utah* only charged conspiracy to commit acts injurious to public morals.) Our own Supreme Court, has pointed out that the Constitution of the State of California requires all general laws to be of uniform operation. (Const., art I, § 11.) "That provision will not tolerate a criminal law so lacking in definition that each defendant is left to the vagaries of individual judges and juries. Yet, as we have pointed out above, such is the inevitable result of attempting to enforce a law punishing a 'common drunk,' whereunder a person drunk, for example, once a week for four months could be found guilty of a violation of subdivision 11 of Penal Code, section 647, in one jurisdiction but not in another." (*In re Newbern*, 53 Cal.2d 786, 797 [3 Cal.Rptr. 364, 350 P.2d 116].)

rightly, that is, as the jury subsequently estimates it, some matter of degree." (*Nash* v. *United States,* 229 U.S. 373, 377 [33 S.Ct. 780, 57 L.Ed. 1232]; see also *United States* v. *Petrillo,* 332 U.S. 1, 7 [67 S.Ct. 1538, 91 L.Ed. 1877]; *United States* v. *Ragen,* 314 U.S. 513, 523 [62 S.Ct. 374, 86 L.Ed. 383]; *United States* v. *Wurzbach,* 280 U.S. 396, 399 [50 S.Ct. 167, 74 L.Ed. 508].)

Courts have looked far afield for aids in construing statutes in such a way that language, which at first glance seems vague, acquires certainty. Therefore we proceed to examine what help we can get from sources other than the statute itself.

First of all, if the statute has been judicially construed, such construction of the statutory words becomes part of the statute "as if it had been so amended by the legislature." (*Cramp* v. *Board of Public Instruction,* 368 U.S. 278, 285 [82 S.Ct. 275, 7 L.Ed.2d 285]; *Winters* v. *New York, supra,* p. 514.) Diligent research by counsel, by amicus curiae[8] and by ourselves has not revealed any authoritative construction of that portion of section 650½ now under discussion, either in this state, or in any other having an identical statute.[9] The one New York decision relied on by the appellate department —*People* v. *Radaha,* 69 N.Y.S.2d 722—which defined "public decency" as "the moral standard by which the people in the various communities of the State abide. . . ." was reversed by a higher court. (*People* ex rel. *Radaha* v. *Mock,* 69 N.Y. S.2d 725.)

At least two decisions from other states deal with statutes similar to but not identical with ours. In *State* v. *Waymire,* 52 Ore. 281 [97 P. 46, 132 Am.St.Rep. 699, 21 L.R.A. N.S. 56] and *Roberts* v. *State,* 27 Okla.Crim. 97 [225 P. 553] the courts discussed statutes which prohibited the wilful and wrongful doing of an act "which openly outrages the public decency *and is injurious to public morals."* The Oregon court came to the conclusion that its statute was directed against offenses which at common law were known as "indictable nui-

---

[8]The City Attorney of Los Angeles and Messrs. Kurlander, Shettler & Solomon have filed briefs for which we are most grateful.

[9]Section 650½ of our Penal Code was enacted by Statutes 1903, chapter 201. The identical New York law appears to be at least 22 years older. Several of the states, at one time or another, have enacted similar but not identical statutes. One distinction between at least two of such other state laws and section 650½ is the addition of the words "and is injurious to public morals" after the words "public decency," as contained in our statute. The Oregon and Oklahoma laws, later adverted to, are of that type. The Georgia statute, also discussed, adds the requirement that the act "tend to debauch the morals."

sances."[10] It did not otherwise define the crime, but simply referred to a series of English cases, later discussed in this opinion, which held certain acts *"contra bonos mores"* to be indictable offenses. The Oklahoma court was more specific. "The true rule of interpretation of this statute should be and is that any act which is so grossly immoral as to shock the sense of decency of self respecting people as a whole, or an act manifestly indecent and repugnant to the usages and customs of civilized society, or *any act which is unquestionably criminal, though not covered by any other criminal statute,* is a violation of the act, independent of what the people of any particular community may think about it." (*Roberts* v. *State, supra,* p. 103. Italics added.)

Apart from the fact that the Oregon statute by its very wording solves one of our problems, in that it contains the words "and is injurious to public morals," this judicial definition raises more problems than it solves. ▪ It seems to assume that an act can be "unquestionably criminal" although it is not covered by a criminal statute. This, as we will discuss below at some length, simply cannot be.[11]

*Irven* v. *State,* 138 Tex.Crim.Rep. 368 [136 S.W.2d 608] involved a Texas statute which made it a misdemeanor for the

---

[10]The only indictable nuisances listed by Blackstone (4 Blackstone, 166-173) which generally fall in the field of decency and morals are disorderly inns, brothels, gaming houses, stage plays, stages for rope dancers, mountebanks and the like, eavesdropping, being a common scold, idleness, luxury and gaming. Thus if the Oregon court is correct, its analysis leads into a blind alley, but as the cases cited by it show, it probably used a broader definition of the word "nuisance" than did Blackstone.

[11]In *Roberts* v. *State, supra,* the defendant, a white man, was said to have outraged public decency and injured public morals by associating with a Negro woman in public and in private and by living with her. The conviction was reversed for technical defects in the indictment, although the court declared that "Social equality between the races is of course unthinkable; such equality would bring about the moral degradation of both races." The interesting part of the opinion from our point of view is that the court declared in the strongest possible language that the trial judge *should not have instructed the jury to apply its* "common sense of the community and the sense of decency, propriety and morality which most people entertain in the community in which the acts were alleged to have been committed." The court held that all penal laws must operate uniformly in every place 'within the territorial limits over which they extend. "To hold that a penal law may or may not operate as such in a particular community, dependent upon public sentiment in that community, would in its last analysis amount to the antithesis of law and result in a kind of anarchy where every community might establish its own penal regulations." We mention this merely because of petitioners' argument, which we do not reach, that there was no evidence before the court of what the community standards of this state are. (cf. *Jacobellis* v. *Ohio,* 378 U.S. 184, 195 [84 S.Ct. 1676, 12 L.Ed.2d 793]; *In re Harris,* 56 Cal.2d 879,880 [16 Cal.Rptr. 889, 366 P.2d 305].)

holder of a liquor license to permit at his place of business " 'any conduct by any person whatsoever that is lewd, immoral, or offensive to public decency.' " An information against the defendant alleged that he permitted a customer on his premises who was intoxicated and whose conduct in such intoxicated condition "was then and there offensive to public decency." The court ordered the prosecution dismissed, stating that the term "offensive to public decency" was "too indefinite of enforcement." (Followed in *Chapa* v. *State,* 170 Tex.Crim.Rep. 509 [342 S.W.2d 430].)

A finding of uncertainty is often avoided if the court can derive assistance from the legislative history or purpose of the statute or a settled common law meaning of its terms. (*In re Newbern,* 53 Cal.2d 786, 795 [3 Cal.Rptr. 364, 350 P.2d 116] ; *People* v. *McCaughan,* 49 Cal.2d 409, 414 [317 P.2d 974].)

The legislative history and purpose of the statute in this state is unknown to us, but for such history and purpose in the state of New York, which has had and still does have an identical statute on its books (New York Penal Law, § 43) we are indebted to the court in *People* v. *Most,* 36 Misc. 139 [73 N.Y.S. 220] : "The plain and obvious intent of this was to leave in the Code a little of the flexibility of the common law to meet cases which they had failed to specify in the preceding sections. That the words of this section are general is just what might be expected from the nature of the case. The purpose of the section is to try offenders for something not 'expressly prescribed by this Code.' If the offense was one expressly prescribed by the Code, then clearly the offender must be tried under the section prescribing it. It is only offenses not prescribed in the Code that can be tried under this section. *This section is the legislative mandate and warrant for courts to look outside of all the other sections of the Code to discover offenses not specified in the Code;* otherwise the section is meaningless. It is fair to presume that the Legislature thought that crimes would crop up that would 'seriously injure the person or property of another,' or 'seriously disturb or endanger the public peace,' or 'openly outrage public decency,' that were not mentioned in the body of the Code, and so *this commission was issued to the courts to explore such new fields of crime as they may appear from time to time."* (*Ibid.,* pp. 140-141. Italics added.)

Leaving aside, that a method of criminal legislation, which to use the words of the court, makes it a judicial function "to explore such new fields of crime as they may appear from time

to time" is wholly foreign to the American concept of criminal justice[12] (U.S. Const., art. I, § 10, cl.1; Cal. Const., art. I, § 16; Pen. Code, § 6; *People* v. *Harris*, 191 Cal.App.2d 754, 758 [12 Cal.Rptr. 916]), it seems obvious that if the court's historical information is correct, no common law definition of the offense is likely to exist, because the Legislature had no common law crime in mind.

Our own research persuades us that the historical analysis of the court in *People* v. *Most, supra,* is almost, but not quite correct. It must be remembered that the English courts did not operate under a system of separation of powers as strict as ours, that within limits which need not be further discussed they were much freer to "discover" new offenses and that when they did so, they were under no compulsion to define the offense with the exactitude of a legislative enactment, particularly one which is subject to constitutional scrutiny. As recently as 1961 Viscount Simonds stated in the House of Lords, in *Shaw* v. *Director of Public Prosecutions* [1962] A.C. 220, 267 : "In the sphere of criminal law I entertain no doubt that there remains in the courts of law a residual power to enforce the supreme and fundamental purpose of the law, to conserve not only the safety and order but also the moral welfare of the State, and that it is their duty to guard it against attacks which may be the more insidious because they are novel and unprepared for. . . . It matters little what label is given to the offending act. To one of your Lordships it may appear an affront to public decency, to another considering that it may succeed in its obvious intention of provoking libidinous desires it will seem a corruption of public morals. Yet others may deem it aptly described as the creation of a public mischief or the undermining of moral conduct."

---

[12] The kind of blank check from the Legislature of which the New York court speaks, not only poses problems of due process because of vagueness, but raises very serious questions concerning the principle of separation of powers. (11 Cal.Jur.2d "Constitutional Law" § 132.) This, of course, is primarily a question under our state Constitution. Compare a German law, signed by Adolf Hitler on June 28, 1935 which, in translation, reads in part as follows: "Whoever commits an act which the law declares to be punishable *or which deserves punishment according to the fundamental concepts of a penal law and sound popular feeling,* is punishable. If there is no penal law which directly applies to such deed, it shall be punished according to the law the basic concept of which is most applicable." An old Chinese statute quoted in *Chicago & N.W. Ry. Co.* v. *Dey,* 35 F. 866, 876 is said to have read: " 'whoever is guilty of improper conduct, and of such as is contrary to the spirit of the laws, though not a breach of any specific part of it, shall be punished at least forty blows; and when the impropriety is of a serious nature, with eighty blows.' "

We believe that whoever drew the first American statute similar to, or identical with, the portion of section 650½ which we are discussing, had in mind a rather ill-defined crime first "discovered" in 1663 in the case of *Rex* v. *Sedley*, 1 Sid. 168.[13] The court held that the King's Bench "was the *custos morum* of all the King's subjects; and that it was then high time to punish such profane actions, committed against all modesty, which were as frequent, as if not only Christianity, but morality also had been neglected."

We are again indebted to the House of Lords for an analysis of how this, to us, rather remarkable claim of jurisdiction, came about. "The time of Charles II. was one of notorious laxity both in faith and morals, and for a time it seemed as if the old safeguards were in abeyance or had been swept away. Immorality and irreligion were cognizable in the Ecclesiastical Courts, but spiritual censures had lost their sting and those civil Courts were extinct, which had specially dealt with such matters viewed as offences against civil order. The Court of King's Bench stepped in to fill the gap." (*Bowman* v. *Secular Society Limited* [1917] A.C. 406, 456-457.)

In 1774 in *Rex* v. *Delaval*, 3 Burr. 1434, Lord Mansfield declared unequivocally that: ". . . this Court is the *custos morum* of the people, and has the superintendency of offences *contra bonos mores*: and upon this ground, both Sir Charles Sedley and Curl, who had been guilty of offences against good *manners*, were prosecuted here." (Italics added.)

It would be a waste of space to detail all the acts which were found punishable under the broad principle thus declared.[14] Most of the cases are discussed, debated and dissected in *Shaw* v. *Director of Public Prosecutions, supra*. In none of them have we found any exact definition of the crime. The first case among the many examined which even uses the words of our statute—outraging public decency—is *Regina* v. *Wellard* (1884) 14 Q.B.D. 63, a run-of-the-mill case of indecent exposure by the defendant in front of a group of girls.

[13]The case was referred to quite recently in the concurring opinion of Mr. Justice Douglas in *Memoirs* v. *Massachusetts*, 383 U.S. 413, 428 [86 S.Ct. 975, 16 L.Ed.2d 1], footnote 4. Sir Charles appeared nude on a balcony at Covent Garden, talked profanely and behaved quite disgustingly in other ways.

[14]It is interesting to note, however, that it was held not to be against *bonos mores* to bet on the outcome of an appeal in the House of Lords. (*Jones* v. *Randall* (1774) Lofft. 383, 385.) On the other hand, digging up a corpse was "highly indecent and contra *bonos mores*." (*Rex* v. *Lynn* (1788) 2 Durn & E. 733.) Needless to say we have found no case involving semi-nudity, akin to the case at bar.

Even there the phrase is not further defined. As late as 1961, in *Shaw* v. *Director of Public Prosecutions, supra,* counsel for the prosecution had to argue that "conduct calculated and intended to outrage public decency" was an indictable crime. (*Ibid.,* p. 248.) This, however, was his definition, not necessarily that of the many authorities he cited.

The true historical posture of section 650½ and of its brethren and cousins vis-a-vis the common law appears to be this: that it was indeed intended to codify a crime, cognizable by the King's Bench, but never given a definitive description, left purposely vague in order to preserve a flexible judicial attitude toward all kinds of devilry the King's subjects were capable of committing and that it was the intent of the various American legislatures to confer upon the courts a similar power to put down mischief wherever it arose. That such an intent is contrary to our Constitutions and the genius of our criminal law has already been discussed. At this point we merely look to the legislative history and the common law precedents to discover whether the statute can be saved by reading into it some well settled common law meaning. There is no such common law meaning and, in view of the history of the crime involved, it would be very surprising if there were.

Finding no help as far as judicial construction of the entire phrase—"openly outrages public decency"—is concerned, we now turn to some of the particular words which make it up and to their antonyms.

The word "decency" was defined in *Universal Film Manufacturing Co.* v. *Bell,* 100 Misc. 281 [167 N.Y.S. 124] as being synonymous with "propriety of action, speech, dress etc." In *Hall* v. *State,* 176 Md. 488, 493 [5 A.2d 916], the Maryland Court of Appeals had this to say: "As applied to conduct, it might be said that the word means compliance with current standards of socially desirable conduct which are generally accepted as proper but that would be merely to resolve one doubt in terms of another. Because 'current standards of socially desirable conduct' may mean one thing in one court and something else in another court." These authorities seem to point toward "manners," rather than "morals."

As might be expected "indecent" has received more extensive judicial treatment though, unfortunately, not at all uniform. Thus while the Supreme Judicial Court of Massachusetts informs us that the word is so common that it may be assumed that any ordinary jury would understand it without definition (*Commonwealth* v. *Buckley,* 200 Mass. 346, 352 [86

N.E. 910, 128 Am.St.Rep. 425, 22 L.R.A. N.S. 225]), the Arkansas Supreme Court says that the word means "morally offensive" (*Dillard* v. *State*, 226 Ark. 720 [293 S.W.2d 697]), New York and Texas[15] think that it means "obscene" (*People* v. *Brooklyn News Co.*, 12 Misc. 2d 768, 771 [174 N.Y.S.2d 813, 817][16]; *Janus Films, Inc.* v. *City of Fort Worth* (Tex. Civ. App.) 354 S.W.2d 597, 600—affirmed 163 Tex. 616 [358 S.W.2d 589]), in Georgia it signifies "unseemly, unbecoming, grossly vulgar, indecorous, unfit to be seen or heard" (*Wood* v. *State*, 45 Ga.App. 783, 788 [165 S.E. 908]), and one federal judge, with a strong feeling for the nuances of meaning, says that the word means more than "indelicate" and less than "immodest." (*United States* v. *Loftis*, 12 F. 671.) It is a pity that he adds: "And I think it is obscene, also." (*Ibid,* p. 672.)

On the other hand the Supreme Court of Louisiana in *State* v. *Kraft*, 214 La. 351 [37 So.2d 815] says: "The word 'indecent,' standing alone, has many different meanings, according to the standard of the individual using or defining the word. In Webster's New International Dictionary the word is defined as 'unbecoming or unseemly'; 'indecorous, as *indecent* haste'; 'morally unfit to be seen or heard'; 'offensive to modesty and delicacy, as *indecent* language'; 'immodest'; 'impure'; 'gross'; 'obscene.'" The court then goes on to hold that an indictment or information which merely charges the defendant with having in his possession an indecent print and movie entitled "Mom and Dad" and the statute, upon which the information was based, were invalid: "It is sufficient to say that a criminal statute, in order to be valid and enforceable, must define the offense so specifically or accurately that any reader having ordinary intelligence will know when or whether his conduct is on the one side or the other side of the

[15]These and other decisions equating "indecent" with "obscene" appear to do so under constitutional compulsion; any other interpretation of the word would infringe on First Amendment rights. See for example *Memoirs* v. *Massachusetts*, 383 U.S. 413, 418 [86 S.Ct. 975, 16 L.Ed.2d 1], footnote 6.

[16]It is interesting to note that in New York it has also been ruled that a film of a nudist colony which showed "exposed portions of human bodies" was not indecent because it showed no full exposure of any adult nude body. (*Excelsior Pictures Corp.* v. *Regents of University of New York*, 2 App.Div.2d 941 [156 N.Y. S.2d 800].) In *People* v. *Burke*, 267 N.Y. 571 [196 N.E. 585]; affg. 243 App.Div. 83 [276 N.Y. S. 402] it was held not to be violative of section 43 of the Penal Law for defendants to sell tickets at $1.00 apiece, the purchase of which entitled the holder to participate in, or to watch, nude gymnastic exercises performed by members of both sexes.

border line between that which is and that which is not denounced as an offense against the law."[17] (*Ibid.*, p. 355.)

Dictionary definitions of the word "indecent" are no more precise than those in opinions, which is only natural since the opinions frequently rely on the dictionaries. Without prolonging the matter too much, they, like the opinions, cover the spectrum between "indecorous" and "obscene."

"Public decency," standing alone, appears to have received very little judicial attention. We have already adverted to *People* v. *Radaha,* 69 N.Y.S.2d 722, reversed in *People* ex rel. *Radaha* v. *Mock,* 69 N.Y.S.2d 725.[18]

The term "public indecency" appeared in an old Indiana statute which subjected to punishment "every person who shall be guilty of notorious lewdness, or other public indecency . . . ." In two decisions, *McJunkins* v. *State*, 10 Ind. 140 and *Jennings* v. *State*, 16 Ind. 335, the Indiana Supreme Court said: "It would therefore appear that the term public indecency has no fixed legal meaning—is vague and indefinite, and cannot in itself imply a definite offense."

A Georgia statute which punishes "any person who shall be guilty of open lewdness, or any notorious act of public indecency, *tending to debauch the morals*" has been authoritatively construed on several occasions. (*Kitchens* v. *State,* 78 Ga.App. 795 [52 S.E.2d 564] ; *Fowler* v. *State*, 189 Ga. 733 [8

---

[17] The Louisiana statute in question made it a misdemeanor to possess an "indecent print, picture, written composition, model or instrument."

[18] In *People* v. *Tylkoff*, 212 N.Y. 197, 201, 202 [105 N.E. 835], the highest court of New York had an opportunity to define the crime we are discussing. While the court was unanimous in reversing the decision, there were three opinions, none representing a majority. Significantly, however, in an opinion concurred in by two of the justices we find the following passages: "The most casual reading of this statute at once reveals its peculiarities. It is obviously one of those 'dragnet' laws designed to cover newly invented crimes, or existing offenses that cannot be readily classified or defined. . . . If in groping for some standard of public decency which the statute does not fix or define, we seek light in the prevailing common judgment and moral sense of the community where an act is done or words are spoken, we are no better off than we were before. . . . The trouble with this statute is that it fixes no definite standard or rule of public decency; and in the nature of things that is plainly impossible. To the extent that this statute deals with acts and language so obviously offensive to the general sense of public decency that there is really no room for discussion, the courts of criminal jurisdiction will have no difficulty in applying and enforcing its provisions. In all other cases the courts must construe the statute, as best they can, in the light of the particular charge under investigation."

A later New York court said: "Section 43 of the Penal Law is a catchall section of the Penal Law which apparently was intended to be used for the purpose of imprisoning dissolute persons against whom no other provisions of the Penal Law would apply." (*People* v. *Stevens,* 190 Misc. 441 [74 N.Y. S.2d 346].)

S.E.2d 77] and *Redd* v. *State*, 7 Ga.App. 575 [67 S.E. 709].) In the first of these cases, *Redd* v. *State*, the Georgia court defined "indecency" as having not so broad a meaning as it has in popular speech, but broader in meaning than exposure of the human body. "To determine whether an act is indecent within the purview of the statute, the time, the place, the circumstances, and the motives of the actors must be considered. . . . A fair test to determine whether an act is notoriously indecent within the purview of this law is to consider whether the general run of the citizenry of the state would readily recognize it as such . . . and also whether it tends to debauch the morals." (*Ibid.*, p. 580.) It will thus be noted that in Georgia not only was the statute more definite, but the court used its additional prohibition against acts tending to debauch the morals for the very purpose of defining "indecency" as used in the statute.

Yet even a judicial interpretation of "decency" which would equate that term with morality would, in our opinion, not save the statute. An Arkansas law prohibited ". . . any act injurious to the public health, or public morals. . . ." In *Ex Parte Andrew Jackson*, 45 Ark. 158 the Supreme Court of that state said in a case in which the defendant was charged with committing an act "injurious to the public morals": "We cannot conceive how a crime can, on any sound principle, be defined in so vague a fashion. Criminality depends, under it, upon the moral idiosyncrasies of the individuals who compose the court and jury. The standard of crime would be ever varying, and the courts would constantly be appealed to as the instruments of moral reform, changing with all fluctuations of moral sentiment. The law is simply null. The constitution, which forbids *ex post facto* laws, could not tolerate a law which would make an act a crime, or not, according to the moral sentiment which might happen to prevail with the judge and jury after the act had been committed."

Thus even if petitioners here had consulted all the authorities which appear to be available, they would have received little help, and some would have strongly implied, that in the light of modern constitutional law the portion of section 650½ of the Penal Code of which they stand convicted, was unconstitutionally vague.[19]

---

[19]The only decision found by us in which a similar statute was attacked on the constitutional grounds urged by petitioners here is *State* v. *Lawrence*, 9 Okla. Crim. 16 [130 P. 508]. There the charge against the defendant was public betting and gambling at a baseball game, which the

We are not yet, however, completely defeated. Problems of legislative meaning of ambiguous words are often resolved by resort to the context in which a particular word or phrase is used—in other words the canons of construction known as *ejusdem generis* and *noscitur a sociis.* Thus, in *State* v. *Jackson,* 224. Ore. 337, 355 [356 P.2d 495, 503] the Oregon court said that the words "obscene," "indecent" and "immoral" as used in an obscenity statute express but a single attitude which may be described by the single word "obscene." Similarly in *People* v. *Eastman,* 188 N.Y. 478, 480 [81 N.E. 459, 11 Ann. Cas. 302] the defendant was convicted under a statute which made it a crime to "sell, lend, . . . any obscene, lewd, lascivious, filthy, indecent or disgusting book, magazine, pamphlet. . . ." The court held that from the manner in which the Legislature had used the word "indecent" it was clear that the statute was "not an attempt to regulate manners, but . . . a declaration of the penalties to be imposed upon the various phases of the crime of obscenity. The word 'indecent' is used in a limited sense in this connection and falls within the maxim of *noscitur a sociis.*"

Respondent cites *United States* v. *Keller,* 259 F.2d 54, for the proposition that the word "indecent" is not too vague. This is grossly—although, we are certain, unintentionally— misleading. The defendant in *Keller* was prosecuted under Title 18 United States Code section 1463 which made it illegal to mail postal cards containing "language of an indecent . . . character." The case was decided after *Roth* v. *United States,* 354 U.S. 476 [77 S.Ct. 1304, 1 L.Ed.2d 1498] where the

---

information alleged, ''grossly disturbed the public peace, openly outraged public decency and injured the public morals.'' The Oklahoma statute in question—as the Oregon law previously discussed—required proof of an act which not only outrages public decency but also ''is injurious to public morals.'' The Oklahoma court assumed that the statute intended, among other things, to make gambling a crime and its decision is based entirely on the fact that gambling had been characterized as a crime against public decency and injurious to public morals by ''every appellate court in Christendom,'' and that it has a well defined meaning. It also felt itself bound by the decision in *Stewart* v. *State,* 4 Okla. Crim. 564 [109 P. 243, 32 L.R.A. N.S. 505] which had held valid the portion of the statute relating to disturbing the public peace. The case was followed in *Rachel* v. *State,* 71 Okla. Crim. 33 [107 P.2d 813]. We are not persuaded that the case affects the one at bar. First, the statute was somewhat more definite; second, it can be explained simply on the theory that whatever uncertainties there were in the Oklahoma statute in some of its possible applications, gambling was clearly covered. See our discussion of the ''standing'' problem at the end of this opinion. *Chapa* v. *State,* 170 Tex. Crim. 509 [342 S.W.2d 430] is on all fours with *State* v. *Lawrence* and holds the exact opposite.

Supreme Court had sustained Title 18 United States Code section 1461, against an attack on constitutional grounds. Section 1461 prohibited the mailing of material that is "obscene, lewd, lascivious, or filthy . . . or . . . of an indecent character. . . ." The Court of Appeals in *Keller* first held that the word "indecent" as used in section 1463 referred to material of the same character as that included in section 1461. Then it said: "Our view is confirmed by rules of statutory construction. Applying the doctrine of *ejusdem generis*, where general words of description which follow more specific terms are restricted in meaning by those which are specific, the word 'indecent' in Section 1461 is limited in ambit to the area covered by 'obscene, lewd, lascivious.' Applying the doctrine of *noscitur a sociis* to Section 1463, the word 'indecent', which precedes 'lewd, lascivious, or obscene', takes its sense and meaning from the associated words. Accordingly, the description 'indecent' is limited in both sections and the area covered by these sections is identical. Concededly, by dictionary definition, the term 'indecent' has a broader range, but in the context of Section 1463, its meaning is restricted to the sense imparted by the adjectives 'lewd', 'lascivious' and 'obscene.' " (*United States* v. *Keller, supra,* p. 57; see also *Fowler* v. *State,* 189 Ga. 733 [8 S.E.2d 77]; *Kitchens* v. *State,* 78 Ga.App. 795 [52 S.E.2d 564].)

Thus it appears that what saved "indecent" in *Keller* was not any inherent certainty of the word, but the context in which it appeared.

But even this aid to construction is denied us here. Section 650½ is part of a chapter in the Penal Code containing all kinds of miscellaneous offenses such as wire tapping (Pen. Code, § 640), charging a fare for a seeing-eye dog (Pen. Code, § 643.5), disorderly conduct (Pen. Code, § 647), offering rewards with the object of causing the capture of persons "dead" or "dead or alive" (Pen. Code, § 652) and tattooing persons under 18 (Pen. Code, § 653). Section 650½ itself makes illegal, apart from the commission of acts openly outrageous to public decency, such things as "acts which seriously injure the person or property of another" or "acts which seriously disturb or endanger the public peace or health" or the use of another's name in a manner which would affect his moral reputation.

It is thus clear that the context in which the phrase "acts . . . which openly outrage public decency" appears, is of no help.

Other aids to construction, expressly or impliedly recognized by the courts, are unavailable. There are, of course, no administrative rulings (*Federal Tr. Com.* v. *Keppel & Bro.* 291 U.S. 304 [54 S.Ct. 423, 78 L.Ed. 814]; *Cannon* v. *Industrial Acc. Com.*, 53 Cal.2d 17, 22 [346 P.2d 1]) and the words employed obviously have no technical meaning. (*Omaechevarria* v. *Idaho,* 246 U.S. 343 [38 S.Ct. 323, 62 L.Ed. 763]; *In re Newbern,* 53 Cal.2d 786, 795 [3 Cal.Rptr. 364, 350 P.2d 116].)

▪ Finally—and now we really have reached the end of our rope—there have been occasions when an otherwise vague statute has been saved from unconstitutionality by a requirement of specific intent. The classic example is *Screws* v. *United States,* 325 U.S. 91 [65 S.Ct. 1031, 89 L.Ed. 1495]. A parallel California case is *Erlich* v. *Municipal Court,* 55 Cal.2d 553 [11 Cal.Rptr. 758, 360 P.2d 334]. Unfortunately we do not see how the present statute can be saved by that method. In *People* v. *McCaughan,* 49 Cal.2d 409 [317 P.2d 974] defendant had been convicted under a statute which, among other things, prohibited "harsh" and "unkind" treatment of idiots, lunatics or insane persons. The Supreme Court held that the statute was unconstitutionally vague. "The requirement that defendant must have acted with an intent to be harsh or unkind, however, does not make clear what those words mean." (*Ibid.*, p. 416.)

▪ The same is true here. Unless we know—and unless petitioners were adequately advised—what it means to "outrage public decency," the fact that they may have intended to outrage public decency, as they understood it, does not put any more definite content into the term.

▪ We are thus left with a statute said to be purposely vague by the only courts which have ever had occasion to inquire into its purpose and with no guidelines of any kind concerning its intended application. It is proper to point out that here we have far more than a simple problem of determining whether given conduct falls on one side or the other of a reasonably defined prohibition. That problem is faced by courts and juries every day and is, in the nature of things, unavoidable, whether it involves purely a question of fact, a mixed question, or one of law. Here we are faced with a far more basic question—did the Legislature intend to regulate manners, morals, or both, and if so, what is the applicable standard.[20] We have a statute which may truly mean all

---

[20]We leave aside all questions of other possible constitutional prohibitions against regulation of mere manners or mere morals. Similarly, we

things to all men, for if it be said that public decency should not be defined by the standards of the most profligate segment of the community, neither could we accept the definitions of the most prudish. We have a statute which gives the executive almost unlimited power to harass those with whose conduct or morals it is at odds or whom it suspects of having committed other crimes which cannot be proven.

Almost a century ago the Supreme Court said in *United States* v. *Reese*, 92 U.S. 214, 221 [23 L.Ed. 563] : ''It would certainly be dangerous if the legislature could set a net large enough to catch. all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.'' This thought was echoed by our own Supreme Court in *Zeitlin* v. *Arnebergh*, 59 Cal.2d 901, 906 [31 Cal.Rptr. 800, 383 P.2d 152] : ''The city attorney should not thus become an indirect censor of public reading matter; his abuse of such power could constitute an unlawful restraint upon the dissemination of literature not otherwise censorable.'' In his dissent in *Winters* v. *New York*, 333 U.S. 507 [68 S.Ct. 665, 92 L.Ed. 840], Justice Frankfurter, who disagreed with the majority's holding that the New York statute involved was unconstitutionally vague said, in distinguishing *Lanzetta* v. *New Jersey*, 306 U.S. 451 [59 S.Ct. 618, 83 L.Ed. 888] : ''Only a word needs to be said regarding *Lanzetta* v. *New Jersey*, 306 U.S. 451 [59 S.Ct. 618, 83 L.Ed. 888]. The case involved a New Jersey statute of the type that seeks to control 'vagrancy.' These statutes are in a class by themselves, in view of the familiar abuses to which they are put. See Note, 47 Col.L.Rev. 613, 625. Definiteness is designedly avoided so as to allow the net to be cast at large, to enable men to be caught who are vaguely undesirable in the eyes of the police and prosecution, although not chargeable with any particular offense. In short, these 'vagrancy statutes' and laws against 'gangs' are not fenced in by the text of the statute or by the

---

are not concerned with policy considerations which are primarily within the competence of the Legislature. Nor, needless to add, do we take sides in the ancient and current controversy of the extent to which it is the business of the law to enforce morals. (See for example Devlin, The Enforcement of Morals, Oxford University Press (1965); Hart, ''*Positivism and the Separation of Law and Morals*'' 71 Harv. L.Rev. 593; Fuller. *Positivism and Fidelity to Law—A Reply to Professor Hart*, 71 Harv. L.Rev. 630). It is worth noting however that one of the most articulate spokesmen for legal activism in the field of morals, Lord Devlin, has said: ''Real crimes are sins with legal *definitions*.'' (Devlin, ''Law and Morals'' (1961). Italics added.)

subject matter so as to give notice of conduct to be avoided."
(*Ibid.*, p. 540.)

We most regretfully must hold that the portion of section
650½ involved in this proceeding is unconstitutional.[21]

Lastly, we deal with an argument not even advanced by
respondent but which should be noted, namely the question
of petitioners' "standing" to raise the issue of vagueness.

In *Williams* v. *United States*, 341 U.S. 97 [71 S.Ct. 576, 95
L.Ed. 774], the defendant was denied standing to complain of
vagueness because it was "as plain as a pikestaff" that to
beat a confession out of a prisoner was to deprive him of his
constitutional rights. The doctrine of "standing," is,
of course, also recognized in this state. (*In re Cregler*, 56
Cal.2d 308, 313 [14 Cal.Rptr. 289, 363 P.2d 305].)

The problem of standing is a most difficult one and a recon-
ciliation of all decisions may be impossible.[22] The Supreme
Court of the United States has recognized that there have been
"cases where this Court has not applied with perfect consist-
ency these rules for avoiding unnecessary constitutional deter-
minations. . . ." (*United States* v. *Raines*, 362 U.S. 17, 24
[80 S.Ct. 519, 4 L.Ed.2d 524].) Exceptions to the rule
permitting a person to attack a statute only on constitutional
grounds applicable to himself have been recognized. Principal-
ly, where the application of a requirement of standing would
have an inhibitory effect on freedom of speech, no showing of
standing is required. (*Smith* v. *California*, 361 U.S. 147, 151
[80 S.Ct. 215, 4 L.Ed.2d 205]; *Thornhill* v. *Alabama*, 310 U.S.
88, 96-99 [60 S.Ct. 736, 84 L.Ed. 1093]; *Fort* v. *Civil Service
Com.*, 61 Cal.2d 331, 339 [38 Cal.Rptr. 625, 392 P.2d 385].)

We do not have to find that the conduct of petitioner
Jeanne, aided and abetted by petitioner Harlan, amounts to
an exercise of their right to free speech. (cf. *Joseph Burstyn,
Inc.* v. *Wilson*, 343 U.S. 495, 502 [72 S.Ct. 777, 96 L.Ed.
1098].) Nor—as is argued by them—do we say that Mrs. Davis
was artistically expressing in the flesh what Botticelli put on

---

[21]We realize that in doing so we hold invalid a statute which at the
present time appears to be used as an instrument of mercy rather than
of harshness. Our own experience and scholarly research by others—see
*The Consenting Adult Homosexual and the Law: An Empirical Study of
Enforcement and Administration in Los Angeles County*, 13 U.C.L.A.
L.Rev. 643, 674, 772-775—tell us that more often than not, section 650½
is a section to which persons accused of sex crimes will plead guilty—or
of which merciful judges will find them guilty—to avoid the stigma of
registration under section 290 of the Penal Code.

[22]See the extensive discussion in Amsterdam, *op.cit.* 109 U.Pa.L.Rev.
67, 96-104.

canvas. Although, for reasons outlined in the footnote,[23] we have serious doubts whether petitioners have to show standing, we will assume in respondent's favor that they must. ██ The argument would then be that since their conduct was such that whatever interpretation—even the most circumscribed—is given to section 650½, petitioners come so clearly within the proscription of the statute, that they need not be concerned with its shadowy boundaries. We disagree. While petitioners in their subsidiary arguments to the effect that they have not violated the statute, however it is interpreted, have taken positions which may appear untenable to some, we cannot say that in a society in which family magazines, which no one would think of hiding from the children, have for years played peek-a-boo with the female breast, it is "plain as a pikestaff" that a woman who exposes her bust for a brief period, without suggestive movements, before a limited group of adults of both sexes, outrages public decency by any and all definitions of that term.

It should not be necessary to add the following, but experience in how decisions of this nature are treated by casual readers compels us to: 1. Nothing we have said intimates that the Legislature, in a properly drawn statute, cannot prohibit the conduct for which petitioners were convicted; 2. by the same token we have given no consideration whatever to any constitutional problems which would arise if the Legislature did so attempt; and 3. we are not taking judicial notice—as we have been urged to do—nor do we hold, based upon our own experience—as we have also been urged to do—that petitioners' conduct is today's norm and that the decisions of the trial judge and of the judges in the appellate department indicate that they adhered to a standard of conduct or morality which is outmoded.

The writ is granted; the convictions in cases M-32314 and M-32315 in the Municipal Court of the Inglewood Judicial District, County of Los Angeles, State of California are set aside

---

[23]It may well be that petitioners can claim the protection of the rule applied in *Smith, Thornhill* and *Fort.* Even though it is probably fanciful to describe Mrs. Davis' performance as the exercise of her freedom to disseminate ideas, it is plain that section 650½ can be applied to matter protected by the First Amendment. Suppose a defendant is charged with violating section 311.2 of the Penal Code—distribution of obscene matter, which includes books, magazines, newspapers, etc.; suppose further that the prosecution cannot show that the matter is obscene and therefore outside of First Amendment protection. It could still contend that it outrages public decency. Since it is possible to make such use of section 650½, it seems very arguable that the *Smith-Thornhill-Fort* rule applies.

and petitioners are discharged from all restraints, actual, constructive or threatened by virtue of said convictions.

Shinn, P. J., and Ford, J., concurred.

A petition for a rehearing was denied June 24, 1966, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied July 27, 1966.