## WILLIAM HALL *v.* STATE OF MARYLAND
[No. 24, April Term, 1929.]

*Decided April 28th, 1939.*

490

The cause was submitted on briefs to BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*Herman M. Moser* and *Philip Margolis,* for the appellant.

*William C. Walsh, Attorney General, H. Vernon Eney, Assistant Attorney General, J. Bernard Wells, State's Attorney for Baltimore City,* and *William H. Maynard, Deputy State's Attorney,* for the appellee.

OFFUTT, J., delivered the opinion of the Court.

William Hall was convicted in the Criminal Court of Baltimore City of the crime of bastardy, and from the judgment in that case he took this appeal. He was charged with the paternity of a child born of Naomi Saunders on July 18th, 1937. The record presents forty six exceptions taken in the course of the trial to rulings of the trial court on the admissibility of evidence offered to prove that the defendant was the father of the child. The basis of all exceptions is the rule that the mother of a child born in wedlock will not be permitted to testify that some person other than her husband was its father until non-access of the husband be first shown, and the broader rule that until non-access of the husband is shown no evidence is admissible to bastardize the child of a married woman.

The testimony to which those exceptions apply maybe thus summarized: Mrs. Bessie Meyers, mother of Naomi Saunders, testified that before September, 1937, her daughter, Naomi Saunders, was living with her sister, Elizabeth Miller, at 1009 Williams Street in Baltimore, that the child was born on July 18th, 1937, at 1123 S. Hanover Street, that witness lived at that address until 1938, and she then testified "that the first time Naomi

Saunders came to live with witness was on Barre Street in November of 1937 and that the baby was born July 18th, 1937, and also that the baby was born in 1938; that the baby is seventeen months old; that witness is mixed up in her mind; that Naomi Saunders must have lived with her from November, 1936; that witness has seen Mr. Saunders, the husband of Naomi Saunders, when he came to the South Charles Street home," and it may be inferred that the witness moved to the South Charles Street home from Hanover Street. She was then permitted to testify over objection that William Hall, the defendant, had contributed from time to time to the support of the child, and that Naomi Saunders was married to her present husband on March 25th, 1935, that she lived with him for two months, that the husband lives in Baltimore, and is employed by J. H. Rogers in that city, and that Hall "went with" her daughter, Naomi, and frequently visted her at the witness' home.

Elizabeth Miller, sister of Naomi Saunders, testified that Naomi Saunders lived with her at 1114 Williams Street for about three months in 1936, and that during that time she saw nothing of her sister's husband, but she knew that he lived at Walbrook in Baltimore, that during that period of three months Hall called at her house "three nights a week" to see her sister, that she would be "out in the evenings many times" and that if her sister saw her husband on such occasions witness would not know about it.

After that testimony had been given, and with no other proof of non-access on the part of the husband, Naomi Saunders was allowed over objection to testify that William Hall was the father of her child, that during September, October and November she had sexual intercourse with no other person, and that Hall contributed to the support of the child. She also testified that she was separated from her present husband July 5th, 1935, and did not see him again before the months of September, October, and November of 1936, but on cross examination she testified that "her mother, her sister,

and Mr. Hall went to the Moonlight Café at the corner of Light and Lee Streets and that Herman Meyers was there and her husband was there also and her husband, Mr. Saunders, was present all during that time, and that she talked to her husband, Mr. Saunders, and he spoke to her; that she and her husband both spoke together," but she was not alone with him.

Bessie Meyers, recalled, gave this testimony of her recollection of that occasion: "Q. Well, there was an opportunity on that evening wasn't there, for your daughter Naomi to have spoken to Mr. Saunders, her husband, wasn't there? A. Not as I know of. I wouldn't say. "Q. Well, you would not say that she did not speak with him, would you? A. Well, I would not say that she did for I did not see her. "Q. Well, you could not say that your daughter Naomi did not speak with Mr. Saunders in 1936, could you? A. No, sir. "Q. She could or she could not? A. She could, I suppose, yes, sir, and she could not. "Q. That would apply to October of 1936? September, October and November of 1936, wouldn't it? She could have spoken with Mr. Saunders without your seeing or knowing anything about it, couldn't she? A. Of course she could have. I didn't see her and she didn't say anything to me about it."

There was also evidence, uncontradicted, that Hall admitted his "guilt" before a magistrate.

It is apparent that, apart from the testimony of Naomi Saunders, there is literally no evidence which even tends to prove non-access on the part of the husband, except the mere fact of separation. On the contrary, the evidence does show that, although the parties were living apart, they were living in the same city, that her husband had to her knowledge a fixed abode there, that they did meet on friendly terms on at least one occasion, and that on that occasion the husband, the wife, and the paramour were together.

The indigenous severity of the rule first announced in *Goodright v. Moss*, 2 Cowp. 591, 98 Eng. Reprint 1258, that neither husband nor wife will be permitted to say

after marriage that they have had no intercourse and that therefore the offspring is spurious, has been modified in many American jurisdictions, either by statute, or by judicial decision, and there has been no little criticism of Lord Mansfield statement that the rule is "founded in decency, morality and policy," which has revolved for the most part around his use of the word "decency." On the one hand it has been suggested that it is inconsistent with decency to allow a married woman to say that her child born in wedlock is the offspring of her illicit passion, and so stigmatize the innocent victim of her guilt with her shame. On the other, that it is consistent with decency to permit the mother to tell the truth, when a refusal to do so will foist upon her husband the nominal paternity of a child which is not his, and to his humiliation add the burden of supporting another man's bastard. The word "decency" in moral, political and social philosophy, in law, in commerce, and in every day life, has no such fixed or inflexible boundaries that it can be said to mean the same thing at all times to all persons. It cannot therefore be defined in terms of approval or reproach, uninfluenced by the subjective emotions and impulses of those who are required to apply it in the characterization of human conduct. And so it has not unnaturally followed that the application of the rule by different courts has varied as the interpretations placed by those courts on the meaning of the word "decency" used in stating the reason for the rule varied.

As applied to conduct, it might be said that the word means compliance with current standards of socially desirable conduct which are generally accepted as proper, but that would be merely to resolve one doubt in terms of another. Because "current standards of socially desirable conduct" may mean one thing in one court and something else in another court. One court may hold that it is indecent to permit the mother of a child to brand it as illegitimate, another, that it is even more indecent to compel a husband to assume the paternity of a child which he and every one who has any knowledge

of the facts know is not his child, but the child of another. And so the applicable rule has come to be one of case law and precedent, varying with what is called the policy of the varying jurisdictions in which it is applied.

In this state the accepted rule is that where a child is born of a married woman, neither the husband nor the wife is a competent witness to prove non-access at a time when, according to the laws of nature, the husband could have been the father of the child, and that neither the husband, the wife, nor the paramour will be permitted to give testimony which will bastardize the child until such non-access be first shown (*Craufurd v. Blackburn*, 17 Md. 49; *Scanlon v. Walshe*, 81 Md. 118, 31 A. 498; *Howell v. Howell*, 166 Md. 531, 171 A. 869; *Harward v. Harward*, 173 Md. 339, 196 A. 318; *Hale v. State*, 175 Md. 319, 2 A.2nd 17), but if non-access is shown, either the husband or the wife is competent to testify to any fact other than non-access, even though it tends to establish the illegitimacy of the child. *Halsbury's Laws of England, "Bastardy and Legitimation,"* sec. 772, note e.

The evolution of the rule in this state is peculiar. In *Craufurd v. Blackburn, supra,* the court, purporting to follow *Goodright v. Moss, supra,* announced the rule that if marriage be proved or admitted, declarations of the parent will not be permitted to defeat the consequences of the marriage, as that the children are bastards. The rule was broader than that stated in *Goodright v. Moss,* that evidence of the parents would not be admitted to show non-access, which was entirely consistent with the admission of their evidence to show any other relevant fact, such as adultery, and it has been so held in England. *Halsbury's Laws of England, "Bastardy and Legitimation"* sec 772, note e.

In *Scanlon v. Walshe, supra,* the court, purporting to follow *Goodright v. Moss,* quoted this excerpt from the opinion in that case: "It is a rule founded in decency, morality, and policy that the father and mother shall not be permitted to say after marriage that their offspring

is spurious." But it will be noted that the qualifying words "that they had no connection," which are the very core of the rule stated in *Goodright v. Moss,* are omitted, so that the rule stated in those cases is not supported in its full extent by *Goodright v. Moss.*

In *Howell v. Howell, supra,* language in the opinion casts some doubt upon the authority of *Scanlon v. Walshe,* when it speaks of the "supposed authority" of that case, and it is strongly intimated that, non-access having been proved, either the wife or the paramour was competent to testify to the fact of illegitimacy. But the rule stated in that case was restated and approved in *Harward v. Harward, supra,* in so far as it excluded the testimony of the husband or the wife as to non-access.

In *Hale v. State,* 175 Md. 319, 2 A.2nd 17, the exclusion rule was considered for the first time in this state in a filiation proceeding, and in that case the court said: "We think the rule, if not already established by the decisions in this state, should be, that when non-intercourse is shown to the trial court by clear, satisfactory and convincing evidence, then the mother should be held competent to testify as to her relations with the accused and to disclose the identity of the father of her child." While reference in that case is made to the effect of the bastardy statutes on the rule, there is nothing in the opinion to support the conclusion that these statutes abrogated in filiation proceedings the rule recognized in this state for nearly eighty years, that neither the married mother of a child nor her husband can testify to non-access to show that it is illegitimate, but on the contrary the conclusion implicit in the language of the opinion is that those statutes had no such effect.

The rule does not prevent the State from showing that the child of a married woman is illegitimate, nor does it prevent the mother, if non-access is shown, from testifying to adulterous intercourse with the defendant; it does prevent her and the husband from testifying to non-access. For even though adultery be shown, the presumption still prevails that the husband, if he had access,

is the father of the child. *"Kennedy v. State,* 117 Ark. 113, 173 S.W. 842; *Chamberlain v. People,* 23 N.Y. 85, (*dictum*) ; *Comm. v. Shepherd,* 6 Bin., (Pa.), 283; *State v. Reed,* 107 W. Va. 563, 149 S.E. 669, citing *R.C.L.; Mink v. State,* 60 Wis. 583, 19 N.W. 445. Annotations 8 *A.L.R.* 431, 60 *A.L.R.* 381, 68 *A.L.R.* 421, and 89 *A.L.R.* 911, 2 *L.R.A.,N.S.,* 619; *L.R.A.1916B,* 1053; 6 *Ann.Cas.* 816; *Ann.Cas.1917A,* 1031; 13 *B.R.C.* 312; 11 *Eng.Rul. Cas.* 540." 7 *Am. Jur.* 697. For, as said in 2 *Halsbury's Laws of England,* (2nd Ed.), 560: "The presumption of legitimacy continues notwithstanding that the wife is shown to have committed adultery with any number of men.. The law will not permit an inquiry whether the husband or some other man is more likely to be the father of the child, and it must be affirmatively proved, before the child can be bastardised, that the husband did not have sexual intercourse with his wife at the time when it was conceived." That rule goes back as far as *Rex v. Reading,* 8 Geo. 2, 94 Eng. Repr. 1113, cited in *Rex v. Hook,* 95 Eng. Repr. 651, where it is said: "And now it was objected by Sergeant Agar that the order ought to be quashed, because a wife cannot be admitted to prove that her husband had no access to her. And so it was ruled by the whole Court; and they cited The King and Reading in Michaelmas and Hilary, 8 Geo. 2, where Lord Hardwicke said that although a wife might be admitted to prove the fact of adultery, yet she shall not be admitted to prove that her husband had no access, because that may be proved by other persons, and an order of bastardy could not therefore be made upon her oath alone. The case of The King and The Parish of Bedall differs from this, for there were witnesses to prove the husband had no access." See also cases Eng. & Emp. Dig., vol. 3, Title *Bastardy,* secs. 55-62, 2 *Halsbury's Laws of England* 563, notes d-p, 7 *Am.Jur.* "Bastards," secs. 23, 24. For a general discussion of the history and social desirability of the rule, see 3 Maryland Law Review, 79.

It is generally held that statutes merely removing the disqualification of witnesses for interest do not con-

flict with that rule (10 *C.J.S. Bastards,* page 172 sec. 83; 7 *Am.Jur.* 697), but where, as in this state, the statute compels the mother, whether married or not, to disclose under oath the identity of the father of the child, (Code, art. 12, sec. 1), there is very real force in the suggestion that the purpose of the statute is, as to proceedings under it, to permit the mother to testify to any fact tending to support her charge that a man other than her husband is its father. If, however, the presumption of legitimacy in such a case prevails notwithstanding proof of adultery, unless non-access of the husband be proved, the requirement of the statute that she be compelled to name the father of the child, and of the rule that she may not testify to non-access would seem to conflict.

It is undesirable however that there be different rules of evidence controlling the proof of the same fact in different proceedings, so what might be proved in a criminal proceeding could not be proved in a civil proceeding, and if any reasonable interpretation of the statute will avoid that result it would be adopted. It is apparent that the statement required of the mother by the statute is accusatory, that it forms no part of the evidence adduced at the trial of the charge, and that the statute itself makes no reference to the nature or quality of the evidence to be given at any trial of the charge made by the mother, nor to the competence of witnesses who may be called at any such trial.

In the absence of clearer evidence of such an intention than the statute affords, it should not be presumed that the Legislature meant that the rule stated in *Goodright v. Moss, supra,* and followed in this state for nearly eighty years, that neither the husband nor the wife is competent to testify, in a proceeding involving the legitimacy of the child of a married woman, to non-access of the husband, should be changed. Under that rule it may be accepted as definitely settled that if, and only if, non-access be proved, the married mother of a child may testify as to any fact reflecting upon its legitimacy except non-access,

and as to that she cannot testify, and that that rule of exclusion extends also to the husband and the paramour.

Turning to the exceptions, it is found that they fall naturally into three groups, one, those relating to the testimony of the mother as to non-access, two, those relating to the testimony of other witnesses as to facts and circumstances tending to support the charge made in the indictment, and, three, admissions of the defendant.

While some questions involved in the second group were bad in form, it is sufficient to say as to them that the rulings referred to in them are free from reversible error.

In respect to the first group, apart from the evidence of the mother, the evidence is not sufficient to establish non-access, and there was therefore error in permitting the mother to testify that she had had illicit relations with the defendant, and that she had not had sexual relations with her husband. For, except for the fact that the husband and wife were living apart, which is not sufficient, (*Morris v. Davies,* 1837, 5 Cl. & Fin. 163, 2 *Halsbury's Laws of England,* 561, note r), there was no evidence of non-access other than that of the wife. For the same reason there was error in admitting proof of the admissions made by the defendant before the magistrate, 7 *Am.Jur.* 705. Because of these errors, the judgment must be reversed.

*Judgment reversed and case remanded for a new trial.*