SHELLEY, ET AL., ETC. *v.* SMITH, ETC.

[No. 200, September Term, 1967.]

*Decided May 3, 1968.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES, McWILLIAMS and SINGLEY, JJ.

*Carl A. Durkee* for appellants.

*D. Franklin McGinnis* for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

In 1777, during the Easter Term of the Court of King's Bench, *Goodright ex dim. Stevens v. Moss et al.,*[1] came on for a hearing before William Murray, first Earl of Mansfield, then the Lord Chief Justice, Mr. Justice Afton and Mr. Justice Willes. Lord Mansfield "was inspired — apparently by some brooding omnipresence in the sky" [2]—to declare:

> "* * * the law of England is clear, that the declaration of a father or mother, cannot be admitted to bastardize the issue born after marriage." *Id.* at 592.
>
> * * *
>
> "* * * it is a rule founded in decency, morality and policy that they shall not be permitted to say *after marriage,* that they have had *no connection,* and therefore that the offspring is spurious; more especially the mother who is the offending party." *Id.* at 594.

His lordship had a long and distinguished career at the bar, on the bench, in the House of Commons, in the House of Lords and in the administrations of his day, little of which is now remembered. His monument, in the eyes of American lawyers, is the rule set forth above. Although much adverse critical comment [3] has been aimed at the Lord Mansfield rule it has, until our decision today, been embedded in the law of Maryland, at least since *Craufurd v. Blackburn,* 17 Md. 49 (1861). Its subsequent history will be found in *Hawbecker v. Hawbecker,* 43 Md. 516 (1876); *Scanlon v. Walshe,* 81 Md. 118, 31 Atl. 498 (1895); *Howell v. Howell,* 166 Md. 531, 171 Atl. 869 (1934); *Harward v. Harward,* 173 Md. 339, 196 Atl. 318 (1938); *Hale v. State,* 175 Md. 319, 2 A. 2d 17 (1938); *Hall v. State,* 176 Md. 488, 5 A. 2d 916 (1939); *Dayhoff v. State,* 206 Md. 25, 109 A. 2d 760 (1954); *Clark v. State,* 208 Md. 316, 118 A. 2d

---

1. Cowper's Reports (1774-1778) 591, 98 English Reprints 1258.

2. So characterized by Hammond, J. (now C.J.) in *Clark v. State,* 208 Md. 316, 322, 118 A. 2d 366 (1955).

3. See 7 Wigmore, *Evidence* (3rd ed. 1940) 358-71; McCormick, *Evidence* (1954) 146; and Note, *The "Lord Mansfield Rule" And The Presumption of Legitimacy,* 16 Md. L. Rev. 336 (1956).

366 (1955); Note, *The "Lord Mansfield Rule" As To "Bastardizing The Issue"*, 3 Md. L. Rev. 79 (1938); Note, *The "Lord Mansfield Rule" And The Presumption of Legitimacy*, note 3 *supra*. As a result of the extensions, modifications and refinements accomplished by our decisions since *Craufurd, supra*, including those just cited, the rule just prior to 1 June 1963 was:

> (a) When a child is born to a married woman the presumption is that the husband is the father, but the presumption may be rebutted by proper evidence; (b) neither the wife nor the husband may testify to non-access at critical dates and neither they nor the paramour can give testimony that will bastardize the child, until non-access be shown by other testimony; (c) if non-access is so shown, either husband or wife may testify to any other relevant facts, even though the child will thereby be bastardized, such as intercourse of the wife with another man and the identity of the father; and (d) the proof need not be of impossibility of access but only testimony *so clear, satisfactory and convincing as to convince the trier of fact* that the husband did not have intercourse with his wife at a time when conception of the child in question would have been possible. *Goodman v. State*, 236 Md. 257, 259, 203 A. 2d 695 (1964).

In 1960 the General Assembly adopted a joint resolution calling upon the Governor to appoint a commission to study the problems of illegitimacy. The commission, among other things, recommended (in its report filed 6 December 1961) that there be included in the proposed statute a provision that "a married woman and her husband may both testify as to his non-access and other relevant matters in the wife's paternity action against another man, *thus abrogating 'Lord Mansfield's Rule' as to these proceedings.*" (Emphasis supplied.) By Chapter 722 of the Laws of Maryland of 1963 (after Art. III, sec. 38 of the Constitution had been amended) the General Assembly enacted Code, Art. 16, §§ 66 and 66 A to 66 P (both inclusive). Sec. 66 F (b), under the general heading "Paternity Proceed-

ings," provides, in part, under the sub-heading "Hearing without a jury; competency to testify; burden of proof," as follows:

"When any bill or petition filed under this subtitle shall allege, or the court shall determine after the commencement of proceedings thereunder, that the child's mother was married at the time of the child's conception; the presumption that the child is the legitimate child of her husband may be rebutted by the testimony of persons other than the mother and her husband that, at the time the child was conceived, the mother was in fact living separate and apart from her husband, and it shall not be necessary to establish the nonaccess of the husband. *After the court shall have determined that the child's mother and her husband were not living together as man and wife when the child was conceived, both the mother and her husband shall be competent to testify as to the nonaccess of the husband when the child was conceived or to any other relevant matter.*" (Emphasis supplied.)

In *Corley v. Moore,* 236 Md. 241, 203 A. 2d 697 (1964), an appeal from a decree in a paternity proceeding (pursuant to the provisions of § 66 F), Chief Judge Henderson, for the Court, said:

"Under the old law, now repealed, neither the wife, the husband, nor the paramour was competent to testify as to nonaccess. See *Clark v. State,* 208 Md. 316, 321, et seq., where Judge Hammond for the court in an able and exhaustive opinion traces the evolution of the so-called 'Lord Mansfield rule'. * * * Clearly, the rule is relaxed under the new law."

* * *

"We find no requirement in the statute [§ 66 F] that proof of nonaccess must be clear and convincing, as the appellant contends. In this connection it may be noted that in the bill as introduced, the burden of proof was stated to be 'to establish by evidence *so clear, satisfactory and convincing* as to raise in the mind of

a reasonable and unprejudiced person a natural inference that the defendant is the father * * *.' This was deleted in the passage of the bill, and the language quoted above was substituted. *The only proof necessary is that the husband and wife are living separate and apart; it is not necessary to establish nonaccess.* Once the fact is established that they are living separate and apart, the wife can testify as to nonaccess, or any other relevant fact. The burden of proof throughout is the same that is applied in other civil cases, to establish the ultimate fact of paternity, in issue under the pleadings, by a fair preponderance of affirmative evidence." (Emphasis supplied.) *Id.* at 244-246.

Cf. *Baker v. Lease,* 236 Md. 246, 203 A. 2d 700 (1964).

Appellants contend that the chancellors' (Jenifer and Haile, JJ.) disregard of the Lord Mansfield rule, besides being wrong, will be productive of "fearful" results. The principal question before us, therefore, is to what extent, if at all, the Lord Mansfield rule, as modified, applies to the case before us, the facts of which are as follows.

Virtually all of the people involved in this matter hail from the vicinity of either Freeland or New Freedom. Freeland is in Baltimore County quite near the Pennsylvania line. New Freedom is just across the line in York County. Herbert Smith married Gladys Orwig on 12 December 1925. They parted in March 1935. In May 1936 Smith filed a bill for a divorce a vinculo against Gladys in the Circuit Court for Baltimore County alleging adultery with Harry Shelley. Gladys gave birth to the appellee (Larry) on 10 December 1937. In March 1938, Smith was divorced a vinculo from Gladys. She had not interposed any defense.

On 17 September 1938 Gladys and Harry Shelley were married. They parted later on the same day. Gladys gave birth to Joyce Kathleen Shelley (now Sexton) on 20 December 1938. In April 1942 she was divorced a vinculo from Shelley, who made no defense. On 22 June 1963 Shelley died intestate. Surviving him besides Joyce, are Jean L. Shelley and Doris Shelley Hovermale, children by an earlier marriage. Letters of ad-

ministration were issued to Jean and Joyce by the Orphans' Court of Baltimore County.

In June 1964 Larry filed his bill of complaint in the Circuit Court for Baltimore County against Doris, individually, and Jean and Joyce, individually and as administratrices. He alleged, in addition to circumstances tending to support his claim, in his second amended bill, that he is the son of Shelley and that he is entitled to share in his estate. Joyce elected not to defend and agreed to the entry of a decree pro confesso as to her.

The trial began 27 January 1967. Counsel for Larry offered in evidence the proceedings in *Herbert R. Smith v. Gladys O. Smith,* Equity #22740, in the Circuit Court for Baltimore County. The pleadings were admitted over the objection of appellants; the testimony was excluded. Counsel next offered the proceedings in *State v. Harry Shelley,* a criminal information, #7890, charging nonsupport, filed in the Circuit Court for Baltimore County on 23 May 1939. Shelley was convicted on 5 June 1939, by Judge C. Gus Grason (later a member of this Court) of the nonsupport of "his minor children" Larry and Joyce. On the same day he signed a personal recognizance in which was recited the fact of his conviction of the nonsupport of "his minor children" Larry and Joyce. The proceedings were admitted over the objection of appellants. Offered next was a certified copy of the proceedings in *Shelley v. Shelley,* No. 58, October Term, 1941, in the Court of Common Pleas of York County, Pennsylvania. The proceedings were admitted over the appellants' objection.

Early Flinchbaugh married the sister of Gladys. He testified that in 1936 and 1937 Herbert Smith was not living with Gladys.

Smith was produced as a witness on behalf of Larry. He said he was living with his parents during 1936 and 1937 and he declared that after he and Gladys were separated in March 1935 he never thereafter lived, had access to nor intercourse with her. He denied that Larry was his son. He said that in his bill for a divorce he named Shelley as the man with whom his wife had committed adultery and that Larry "positively" favored Shelley. During 1936 and 1937, he said, Shelley "was going with" Gladys. He identified 27 letters (from Gladys to Shelley), later offered in evidence, as having been written by Gladys.

Larry testified he was "sometimes known as Larry Shelley." He identified as his a school report certifying that "Larry Shelley" was eligible for promotion to the 8th grade. He identified also a certificate, dated 18 June 1948, recognizing the "faithful attendance and creditable work" of Larry J. Shelley at "Vacation Bible School." At the time he said he was "going by the name of Larry Shelley" and that he was living with his mother, his sister Joyce, and James Robinson whom his mother had married after she divorced Shelley. The report and the certificate were admitted over appellants' objection. Offered next was a snapshot which Larry identified as having been taken by his "brother-in-law" in the summer of 1956 at Shelley's farm. The notation on the back of the print, which Larry said he wrote in 1956, reads, "Sister Joyce & myself taken in Dads buggy summer 1956 at his farm." There is no doubt they resembled each other when this picture was taken. The print was admitted over objection as was another one Larry said was taken at the same time showing a man seated on the ground holding two dogs. The notation, which Larry said he wrote at the time, reads, "Dad & his dogs summer on the farm 1956 Freeland Md." When he was little, he recalled, his mother often took him and Joyce to the farm to see Shelley. He believes Shelley was his father because "that is what * * * [his] mother always told" him. When he was older he visited Shelley "several times a month" occasionally helping him water a horse and put in corn.

Jean Shelley testified she lived with her father until 1945 when she left home. Asked about Gladys' reputation she said "it wasn't a good reputation from the very point she and * * * [her] father were carrying on an affair while she was married." She said her father "denied that either one of them [Joyce and Larry] was his children." The letters, she admitted, were in Gladys' handwriting, that her father had them, that the "Dear Harry" in the letters was her father and she would not deny they were written to him. The 27 letters had been found by Larry and Joyce in the loft of the garage at the Shelley farm. They were received in evidence over the objection of appellants.

The chancellors filed their opinion on 23 February 1967. The decree declaring Larry to be entitled to share in the distribution of Shelley's estate as a son was dated 10 April 1967 and filed the same day.

## I.

Obviously the first question to be resolved is the admissibility vel non of the testimony of Smith. If it must be excluded the chancellors' finding that Shelley is the father of Larry cannot be sustained. If it is admissible then, considering it together with the remaining admissible evidence, we would be unwilling to say that the finding of the chancellors is clearly erroneous. Appellants, relying on *Scanlon v. Walshe, et al.,* 81 Md. 118, 31 Atl. 498 (1895), and the Lord Mansfield rule, contend it was error to admit Smith's testimony.

The case at bar is not, of course, the kind of paternity proceeding envisaged by Code, Art. 16, § 66 F and the relaxation of the Lord Mansfield rule, as set forth in § 66 F (b), at least at first blush, does not appear to be applicable to any but the special proceeding therein provided. If this is indeed the case then a quite undesirable anomaly presents itself; viz., the existence of two different rules governing the resolution of identical issues of paternity, the Lord Mansfield rule in cases like the one before us and the § 66 F (b) rule in paternity proceedings under the statute. We think this should not be. It contravenes both good order and common sense. In this regard Judge Offutt's comment in *Hall v. State,* 176 Md. 488, 497, 5 A. 2d 916 (1939) seems especially relevant. He said, for the Court:

"It is undesirable however that there be different rules of evidence controlling the proof of the same fact in different proceedings, so what might be proved in a criminal proceeding could not be proved in a civil proceeding, and if any reasonable interpretation of the statute [Code, Art. 12, sec. 1 (1924)] will avoid that result it would be adopted."

Appellants lean more heavily on *Scanlon v. Walshe, supra.* In that case Carlotta Simmonds had been married to her husband for 17 years when, in 1875, she sought to divorce him. She alleged in her bill that she had 6 children by "said marriage," aged respectively 15, 13, 11, 9, 7 and 5, and that her conduct had always been proper and above reproach. The decree divorcing her a vinculo from Simmonds and awarding her the custody of the 6 children was passed in November 1876. In August 1877

she married David Walshe. In July 1883 she filed a petition in the Circuit Court of Baltimore City, reciting her divorce and subsequent remarriage and the award of the custody of the children born to her and Simmonds and praying that the names of the 3 youngest children be changed from Simmonds to Walshe. She made affidavit to the truth of the representations in the petition and, in due course, an order changing the names of the 3 children was passed.

Walshe died in 1891. In his will there were bequests to her and "her three children" (the youngest three). Since the will, for some reason not explained, was not operative as to real estate, Carlotta filed a bill for the sale of the real estate and the distribution of the proceeds to herself and the 3 youngest children, claiming that Walshe was their father and that he had acknowledged them as his children. Carlotta testified that Walshe was their father. The lower court found for her and Walshe's relatives appealed.

Our predecessors were of the opinion (in *Scanlon*) that the provisions of the statute [4] (legitimation by marriage and subsequent acknowledgment) applied only to "illegitimate" children and that the illegitimacy of the 3 youngest Simmonds children would first have to be proved before the provisions of the statute could become operative. Judge Fowler, writing for the Court, said:

---

4. Which was Code, Art. 46, § 29 in 1895. It is now Code, Art. 46, § 6 (1957) (unchanged since 1820) which provides as follows:
"If any man shall have a child or children by a woman whom he shall afterwards marry, such child or children, if acknowledged by the man, shall, in virtue of such marriage and acknowledgment, be hereby legitimated and capable in law to inherit and transmit inheritance as if born in wedlock."

The Court, in *Scanlon*, discussed, at length, the earlier case of *Hawbecker v. Hawbecker*, 43 Md. 516 (1876), which rejected the contention that the Legislature did not intend the statute to apply to the offspring of persons who are under an impediment to marry when the offspring are conceived and born. The Court, in *Scanlon*, appears to have agreed that the statute would have been applicable to the facts in that case, if illegitimacy had, in fact, been proved.

"'The mere fact of marriage and acknowledgement should not, under the facts of this case, be received as proper evidence of illegitimacy. The fact of illegitimacy should *first* be proved, and then the marriage and acknowledgment may be offered to prove paternity. * * * Now, the only testimony before us which can be properly resorted to to prove illegitimacy is that of the plaintiff, Carlotta Walshe, which, as we have seen, is inadmissible for that purpose." *Id.* at 131-32.

Although the Court, in *Scanlon,* cited the Lord Mansfield rule in support of the inadmissibility of Carlotta's testimony it seems to have made estoppel the sheet anchor of its decision. Judge Fowler said further:

"But the testimony of Carlotta Walshe, as well as that of the adulterer, if he were alive, would be inadmissible to show bastardy, and equally so his declarations, because they are both estopped to swear to a state of facts in conflict and inconsistent with the proceedings for divorce and for change of name of her three younger children. She will not be allowed now to come into Court and recklessly contradict what she alleged in the one and swore to in the other." *Id.* at 132.

Judge Fowler administered the coup de grace in the concluding paragraph of the opinion:

"We feel bound to say, however, that if all the testimony we have thus excluded were properly before us, we could not, while giving full force and effect to the legal presumption of legitimacy, and in the absence of that *strong, distinct, satisfactory* and *conclusive* testimony required to overcome that presumption, do otherwise than reverse the *pro forma* order appealed from." *Id.* at 133-34.

It will at once be noted that there is a significant difference between the facts in *Scanlon,* which Judge Fowler thought to be "shocking to every sense of decency and morality", and the facts in the case at bar. There was no estoppel working against

Smith. He was not the adulterer, he is not a party to the case before us, his testimony was not inconsistent with any prior testimony or action nor has he any personal interest in the outcome of the case. Also, it might be noted that Carlotta Simmonds and her husband were not living separate and apart when the 3 youngest children were conceived and born. But, as we have said, the Court, in *Scanlon,* also relied, to a lesser degree to be sure, on the Lord Mansfield rule and it is in this area that we must decide whether we shall continue to tread the well-worn Mansfield path or turn on to the new road opened up by § 66 F (b).

There is little doubt that in recent years public policy in respect of problems arising out of illegitimacy has undergone a change. While it is true, as the report of the governor's commission will show, that most of the public's interest and concern has been generated by the increasing number of illegitimates receiving public welfare monies, nevertheless, the new mechanism which has been provided for determining paternity is comprehensive and reasonably precise and it seems to us to make little difference that its main purpose is the shifting of some of the burden of financial support of illegitimates from the taxpayer to the father. Moreover, § 66 H (g) seems to endow a declaration of paternity with the same status enjoyed by any other order or decree in equity.[5] Accordingly, if M marries W and thereafter acknowledges W's child (whether born before or after the marriage) to be his own we see no reason why the child's rights to inherit from M should in any respect depend on whether M's paternity was established in a paternity proceeding pursuant to §§ 66 A to 66 P or in an equity proceeding like the case at bar. And if that be so then the rules of evidence controlling the proof of paternity ought to be the same in either case. *Hall v. State, supra.* And there seems to be no reason why the rules emanating, in the first instance, from the

---

5. "A declaration of paternity contained in any order is final and not subject to the revisory power of the court except in the manner and to the extent that any other order or decree of a court of equity in this State may be subject to the revisory power of the court by virtue of any statute, rule of court, or the established principles of practice and procedure in equity."

governor's commission and, in large part, adopted later by the Legislature should not apply in the relatively few cases where paternity is in issue in connection with questions involving the right to inherit rather than the right to support and maintenance. We so hold and to whatever extent *Scanlon* is inconsistent with our holding it is overruled.

Viewing the evidence in the light of § 66 F (b), as now we must, it will be observed that the fact that Herbert and Gladys Smith were living separate and apart from each other in 1936 and 1937 was established by the uncontradicted testimony of Early Flinchbaugh. Proof of nonaccess not being required, Smith thereupon became competent "to testify as to [his] nonaccess * * * when the child was conceived" or "to any other relevant matter." Whether his testimony, standing alone, is sufficient to sustain the finding of the chancellors we express no opinion. They had before them, however, in addition to Smith's testimony, the testimony of Larry, the report card, the bible school certificate, the two snapshots taken at the farm in 1956, Jean Shelley's statement that Gladys and her father "were carrying on an affair while she was married," the letters from Gladys to Shelley which, at very least, suggest a continuing clandestine affair, and the marriage and immediate separation of Gladys and Shelly. Taking it all together we cannot say the chancellors' finding that Larry is the son of Shelley is clearly erroneous.

## II.

There remains the question whether Shelley, after marrying Gladys, ever acknowledged Larry as his son. If he did acknowledge him then Larry became his legitimate son "and capable in law to inherit * * * as if born in wedlock." Code, Art. 46, § 6. We shall review, briefly, the evidence upon which a finding that Shelley did acknowledge Larry to be his son might be supported.

On 10 November 1937, a month before Larry was born, Gladys wrote a letter to Shelley asking for money to "buy some clothes." She said she had been to Towson to try to get Smith's lawyer to expedite the divorce case and she begged Shelley "to go to Towson and see what * * * [he could] do." The letter concludes, "Hoping to see you real soon, With love, Gladys."

There is also a postscript which reads, "Mom said I'll have my fill of you yet, and she heard you never treated your [first] wife right." On 6 December, 4 days before Larry was born, she wrote to "Dear Harry" to tell him not "to forget to come over Wednesday [8 December] afternoon to take * * * [her] to the hospital." She also asked him for "some more money." On 22 December she wrote again to "Dear Harry" to tell him she "came home Saturday [20 December] night." She told him also that "after * * * [he] left on Sunday [12 December] at the hospital * * * [her] nose bled." On 2 January 1938, she wrote to "my dear Harry" chiding him for not coming to see her the evening before. She had not seen his "smiling face for a couple of weeks * * * [nor] felt those kisses," she wrote.

On Tuesday, 13 September 1938, she wrote to Shelley telling him to "come over here sure Wednesday afternoon to go to Towson." Apparently he came Saturday, 17 September, instead, because on that day they were married in Westminster which is perhaps somewhat closer to New Freedom than Towson. As earlier noted they separated later that day, a circumstance which, per se, suggests that the purpose of the marriage was the legitimation of offspring and nothing else.

That Shelley retained possession of the above mentioned letters is undisputed and there is nothing about them to suggest that the information contained therein is not factually correct. Why Shelley would take another man's wife to the hospital in York, Pennsylvania, to be delivered of a child (Larry), visit her there during her recovery, visit her after her return from the hospital, present a "smiling face," bestow upon her kisses she remembered for days, continue a sexual relationship dating back to the spring of 1935, and marry her, after her divorce, when she was again pregnant with Joyce and immediately desert her, unless he recognized both Larry and the unborn Joyce as his own children is difficult to explain.

There seems to be no reason for supposing that Shelley was either compelled or frightened into signing the recognizance in which Larry and Joyce are described as "his minor children." He could have insisted upon the insertion of language disclaiming his paternity but the fact is he did not. A year and a half later he was brought back into court for nonpayment. There

was a hearing before Judge Grason on 2 December 1940 at which he again might have denied his paternity but there is no indication that he did so. Nor is there any indication that he ever contemplated an appeal. Of course, there is some evidence that he denied being Larry's father. Joyce said so and there is evidence that he told the magistrate that Larry was not his son. In this regard the comment of the Supreme Court of Appeals of Virginia in *Hoover v. Hoover,* 131 Va. 522, 109 S. E. 424 (1921) is worth noting:

"That Hoover, on various other occasions denied to his relatives and friends that he was the father of the child, is inconsistent but not in conflict therewith. It is not unusual, however, for men overtaken in such a fault as that with which Hoover was accused, to deny their guilt circumstantially, vigorously, and frequently. The question, however, is not how often he denied it, but whether at any time he recognized Winnie Hoover as his child." 109 S. E. at 425.

The photograph of Shelley taken at the farm in 1956 is not without significance. Larry testified it was taken at the same time the photograph of himself and Joyce was taken and that he made the notation on the reverse side at the time. No effort was made to controvert Larry's testimony. Indeed, neither Doris, Joyce nor the "brother-in-law" was produced as a witness. It seems to us highly unlikely that Larry (then 17 or 18) and Joyce (then 15 or 16) would have been Shelley's guests at the farm if he considered them the children of other people. It also seems unlikely that Larry would have written "Dad & his dogs" if the man in the picture was disclaiming that relationship. He said he visited Shelley several times a month.

In the libel filed in her action for divorce in York County, Pennsylvania, Gladys alleged that Larry and Joyce "were born to the parties." Shelley did not defend the action. Appellants, however, make much of the fact that service of process was obtained by publication and that it does not appear that Shelley ever knew of the existence of the action. The certificates of publication show that the required notices were published 3 times in The Gazette & Daily and 3 times in The York Legal Rec-

ord, both of which are newspapers of general circulation in York County, and twice in The Union News, a newspaper of general circulation in Baltimore County. In light of the proximity of York and Baltimore counties and the towns of New Freedom and Freeland and the fact that Shelley was familiar with both places we think the chancellors could infer that Shelley had actual knowledge of the suit.

All things considered we think there was before the chancellors a web of circumstances of sufficient heft to make us unwilling to say their finding that Shelley acknowledged Larry to be his son is clearly erroneous.

### III.

Appellants have questioned the correctness of a number of the chancellors' rulings on the admissibility of evidence which must be dealt with. We have already disposed of the contention as to Smith's testimony. There was some evidence that Larry's blood type was B positive, Shelley's B positive, and Smith's A minus. Appellants contend its admission was improper. It seems to be agreed this evidence proved nothing and there is no indication the chancellors placed any reliance on it. If admitting it was error, the error was harmless.

The admission of the proceedings (there was no testimony) in the nonsupport case was error, say the appellants. They have not shown us any authority supporting their contention and we fail to see in what respect it might have been incorrect. It will be recalled that the records were admitted only because the chancellors thought they were relevant to the issue of acknowledgement. Any statement, action or failure to act on the part of Shelley touching upon that issue would certainly have been relevant and material. We see no error in the ruling.

The chancellors admitted the pleadings, not the testimony, in the divorce action brought by Smith against Gladys. Appellants say this was error. They say also it was error to allow Smith to refer to a letter he received from Gladys, after he had filed the suit, admitting she "was pregnant by Harry Shelley." Certainly Larry had a right to prove that Smith brought the action on 12 May 1936, that adultery with Shelley was charged and that the divorce was granted on 14 March 1938. It is en-

tirely clear that the child Gladys was carrying when the suit was filed was not Larry, so, if it can be said that the court did err, we cannot see that it resulted in any prejudice. The most it can be said to prove is the adulterous dispositions of Gladys and Shelley and there is much other evidence of that.

The next assignment of error is directed against the admission of the proceedings in Gladys' suit against Shelley in York County, Pennsylvania. We think it was entirely proper for Larry to show that, in that action, paternity was alleged and that it was not denied by Shelley and this seems to us to have been the only useful purpose for the introduction and admission of the entire case. It is only in this context that it is mentioned in the opinion of the chancellors. We think the libel was admissible and if the admission of the balance of the file was error, it was harmless.

The letters from Gladys to Shelley are the subject of appellants' next contention. We think they were properly admitted. It is clear they were written by Gladys and received and preserved by Shelley. Appellants cite *Scanlon* as authority for their exclusion but, as we have said, the rule set forth in § 66 F (g) is now the controlling rule.

Appellants' objection to the admission of Larry's report card and bible school certificate is clearly halfhearted and, in our judgment, without merit.

### IV.

For the reasons stated the decree of the Circuit Court will be affirmed.

*Decree affirmed.*
*Costs to be paid by the appellants.*