JULIA ALTEMUS *v.* JOHN KENT ALTEMUS

[No. 561, September Term, 1972.]

*Decided July 5, 1973.*

The cause was argued before MOYLAN, POWERS and CARTER, JJ.

*James G. Klair, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Darrel L. Longest, Assistant State's Attorney for Montgomery County,* on the brief, for appellant.

*Thomas A. Lohm* for appellee.

POWERS, J., delivered the opinion of the Court.

This appeal involves the Uniform Reciprocal Enforcement of Support Act, which is set out in Code, Art. 89C, §§ 1 to 39. The definition of "state", § 2 (b), includes any state, territory or possession of the United States and the District of Columbia in which this or a substantially similar reciprocal law has been enacted. The record shows that the Territory of Guam has a similar law, Title X, Part III, Guam Code of Civil Procedure.

Julia Dydasco Altemus, a resident of Guam, initiated a proceeding under the Act by a petition filed in the Island Court of Guam in November, 1967. In the supporting papers she alleged under oath that she was married on 5 June 1965, in Guam, to John Kent Altemus, whose address at the time of the petition was 67 Eldrid Drive, Silver Springs, Maryland. She said that they last lived together on 5 October 1965, and that a child, Jennifer Lee Altemus, was born of the marriage on 7 July 1966. She said that the parties were still married. She said that her husband had made no contribution for support of herself or the child, and that she required $50.00 a month for support.

The Island Court of Guam passed an order reciting the filing of the petition, and its substance, expressing the opinion that the respondent should be compelled to answer the petition and be dealt with according to law, and

directing that certified copies of the proceedings be sent to the State Department of Public Welfare, in Baltimore, Maryland. The papers were thereafter transmitted to the People's Court for Juvenile Causes of Montgomery County, where a case was docketed, and a summons issued for John Kent Altemus. After a hearing held on 1 February 1968 that court ordered Altemus to pay $10.00 per week for the support of the child. The court found that Altemus did not have the duty to support Julia, possibly because he told the court that he had obtained a divorce from a court in Juarez, Mexico, although no reason was stated in the order of the People's Court.

Altemus appealed, and the papers in the case were sent to the Circuit Court for Montgomery County, where they were entered on the law docket as a civil appeal. After two summonses issued for Julia as appellee were returned non est, the case remained dormant until March - 1971 when Altemus moved for a jury trial and for a blood test. In August 1971, upon motion by Altemus, the case was transferred to the equity docket.

The circuit court ordered the requested blood test, and it appears from a report by a pathology laboratory in Washington, D. C. that blood samples of the mother and child were tested by the government of Guam in October, 1971, and the results supplied to and correlated by the local laboratory with its test of a blood sample from Altemus. The results were inconclusive.

Two hearings were held in the circuit court, one on 3 February 1972 and one on 28 April 1972. As provided in the Act, Art. 89C, § 12, the State's Attorney's office in Montgomery County represented the interests of Julia and the child. Altemus was represented by counsel retained by him.

The transcript of the hearing held on 3 February 1972 does not indicate whether the equity court was conducting a de novo hearing on appeal from the People's Court for Juvenile Causes, or whether it was exercising its original jurisdiction. The Assistant State's Attorney submitted the petition and supporting papers received from Guam as establishing, at

least prima facie, the obligation of Altemus to make payments for support of Julia and the child.

Altemus was called as a witness and testified concerning the divorce he obtained from Juarez, Mexico, a certified copy of which was received in evidence. He stated that he had married Julia in Guam, and then offered as an exhibit a copy of official orders from the Air Force, dated 22 July 1965, directing that he depart the station in Guam on or about 1 October 1965 and re-assigning him to the United States for separation from military service. There was objection to receipt of this document in evidence on the ground that it was being offered for the purpose of showing non-access. The Assistant State's Attorney contended that the Lord Mansfield Rule prevented the receipt of any evidence from either of the parties on the question of non-access until there had been proof of it from another source. The trial judge considered whether the law required that Altemus cross the threshold of establishing non-access through other witnesses before evidence on the question could be received from him, but reached no conclusion at that time on the question. The document was received in evidence subject to a later ruling on its admissibility. The court and both counsel then concluded that additional time should be made available for both sides to obtain and be prepared to present additional evidence. The case was continued for further hearing.

At the resumption of the hearing on 28 April 1972 Altemus called a longtime friend, Bruce Cramer, as a witness. Cramer testified that he knew that Altemus was in the service and was overseas and that he next saw him in Montgomery County in civilian clothes in October 1965. Cramer was permitted to testify over objection to his recollection of the contents of a letter received from Altemus from Guam in which he related that he was on a 24 hour alert, on 10 minute ready notice, and related also "that he was becoming separated from his wife".

Altemus also called as a witness Robert P. Taylor, who testified that he had known Altemus for some 14 years, and was himself in the Air Force, and had been stationed in Guam from 30 November 1965 until April 1966. Taylor was

permitted to testify over objection that around the last of June or the first of July 1965, while he (Taylor) was in Texas, he received a letter from Altemus in which Altemus stated that he had made a mistake in getting married and had moved back to the base and had been put on alert at that time. Taylor also testified he later became familiar with an area in Guam called Tamuning, which he said was about five miles from the Air Force Base, and that the travel time by vehicle between the two was probably a half an hour.

Altemus himself testified further at the hearing of 28 April and was permitted over objection to relate that after having married Julia on 5 June 1965, he left her early in July and never saw her or talked to her again prior to his leaving Guam in October 1965.

After receiving this evidence from Altemus and from the other witnesses, the source of whose information was Altemus himself, the trial judge indicated that counsel should argue the question of whether the threshold had been crossed. It appears from the record that the judge and counsel were referring either to the threshold inherent in the Lord Mansfield Rule or the threshold established for certain paternity cases under Code, Art. 16, § 66F (b). That subsection provides in substance that when a married woman brings a paternity proceeding against a man who is not her husband, the presumption that the child is the legitimate child of her husband may be rebutted by the testimony of persons other than the mother and her husband that the mother was living separate and apart from her husband at the time the child was conceived.

The record shows that on 13 April 1972 the Assistant State's Attorney filed a series of interrogatories which appear to be propounded to Julia Altemus and to several other individuals living in Guam. The interrogatories appear to have been designed to elicit information regarding the marriage of Altemus and Julia and the length of time they lived together. The record contains no response to those interrogatories nor indeed does it show how, if ever, they were transmitted to the persons to whom they were propounded.

At the conclusion of the testimony taken at the hearing on 28 April 1972 the Assistant State's Attorney asked that the court defer ruling on the case until he received answers to interrogatories, and further indicated the possibility that there may be written depositions. The trial judge said that he would review the objections, presumably to determine if the testimony of Altemus was admissible, and if additional proceedings appeared necessary, he would advise counsel.

No further proceedings were requested by the trial judge prior to his filing on 20 July 1972 of a written opinion and an order dismissing the petition. The opinion referred to the case as a hearing de novo of an appeal from the People's Court for Juvenile Causes. It discussed the threshold to be crossed by evidence from persons other than the mother and her husband under Code, Art. 16, § 66F (b), but found it unnecessary to decide in this case if that threshold had been crossed. The opinion then said:

> "From the proceedings it was obvious that the circumstances of time and distance, and the unavailability of witnesses presented serious obstacles to the introduction of persuasive evidence. The opportunity to produce witnesses having first-hand knowledge of the circumstances of residence on the Island and to effectively cross-examine witnesses attesting to this fact on behalf of the Plaintiff, presented real, substantial and almost insurmountable problems. It is the conclusion of this Court that this issue cannot be fairly met in these proceedings in furtherance of the interests of any of the parties."

The court then concluded that fundamental justice required an avoidance of a determination of the issue of paternity, and that as a result the relief sought could not be granted. The effect, of course, was to deny petitioner the relief she sought, without adjudicating the merits of her claim.

On behalf of the petitioner the State promptly filed a motion to revise the opinion. The motion asserted the State's

understanding of the reason for the continuance: so that the court could decide whether other evidence in the case had crossed the threshold, so as to permit consideration of testimony by Altemus of non-access. The motion further asserted that if the court held that the threshold had been crossed, the petitioner would be prepared to present testimony by way of written depositions on the issues of non-access and paternity. Altemus opposed the petitioner's motion.

The court denied the motion to revise its opinion, saying:

> "The foundation for the dismissal as expressed in the opinion was the conclusion of the Court that the issue of paternity cannot be fairly met in these proceedings."

An appeal to this Court was filed by the State on behalf of the petitioner, within the required time after the original order of dismissal. While the appeal was pending here the State, apprehensive that certiorari rather than appeal may have been the proper route, moved that we treat the appeal as an application for a writ of certiorari. We granted the motion.[1]

We now consider what effect, if any, the Lord Mansfield Rule has in this case. The trial court stated in its opinion that it had ruled that the modification of the Rule enacted by Code, Art. 16, § 66F (b) was applicable to this proceeding, as held by the Court of Appeals in *Shelley v. Smith*, 249 Md. 619, 241 A. 2d 682.

The inception and the judicial history of the Rule were thoroughly reviewed by the Court of Appeals in *Shelley v. Smith, supra*, and in *Clark v. State*, 208 Md. 316, 118 A. 2d 366. No rehash is needed here. We note, however, that in

---

1. The question involved is whether the then People's Court for Juvenile Causes in Montgomery County had original jurisdiction of proceedings under the Uniform Reciprocal Enforcement of Support Act. In the rest of the State such jurisdiction was and is exercised by the equity courts. We are advised that in Montgomery County all cases under the Act are now handled on the equity docket of the circuit court. We need not consider whether the court below in this case was exercising appellate or original jurisdiction, since the case is properly before us in either event.

*Hale v. State,* 175 Md. 319, 2 A. 2d 17, the Court said that "qualifications have been applied to the rule, so rationalizing it that, in this state and elsewhere, the presumption of legitimacy may be overcome when common sense and reason requires that departure". We note also the rather strict application of the Rule to require the exclusion of evidence in *Dayhoff v. State,* 206 Md. 25, 109 A. 2d 760, in which the Court affirmed a conviction of non-support, although the excluded evidence may well have led to a different result.

The paternity subtitle of Code, Art. 16, was enacted in 1963. In 1964 the Court of Appeals affirmed a finding of paternity in *Corley v. Moore,* 236 Md. 241, 203 A. 2d 697, a proceeding brought by a married woman. The Court applied § 66F (b) and, after referring to the previous law, said, "Clearly, the rule is relaxed under the new law".

*Shelley v. Smith, supra,* was an equity case, brought to establish the right to inherit. Judge McWilliams said, for the Court, at page 627:

> "The case at bar is not, of course, the kind of paternity proceeding envisaged by Code, Art. 16, § 66F and the relaxation of the Lord Mansfield rule, as set forth in § 66F (b), at least at first blush, does not appear to be applicable to any but the special proceeding therein provided. If this is indeed the case then a quite undesirable anomaly presents itself; viz., the existence of two different rules governing the resolution of identical issues of paternity, the Lord Mansfield rule in cases like the one before us and the § 66F (b) rule in paternity proceedings under the statute. We think this should not be. It contravenes both good order and common sense."

The opinion went on to say, at page 630:

> " * * * we must decide whether we shall continue to tread the well-worn Mansfield path or turn on to the new road opened up by § 66F (b)."

And further, at pages 630-631:

" * * * the rules of evidence controlling the proof of paternity ought to be the same in either case. *Hall v. State, supra.* (176 Md. 488, 5 A. 2d 916). And there seems to be no reason why the rules emanating, in the first instance, from the governor's commission and, in large part, adopted later by the Legislature should not apply in the relatively few cases where paternity is in issue in connection with questions involving the right to inherit rather than the right to support and maintenance. We so hold * * *."

What the Court did in *Shelley* was not so much to extend a specific statute beyond the limited application the Legislature gave it, but to modify what was then Maryland's version of the common law rule originally enunciated by Lord Mansfield, by engrafting onto our common law the same rule of public policy which was opened up by the enactment of § 66F (b).

While we have modernized the Maryland common law version of the Lord Mansfield Rule, this is not to say that the Legislature may not provide by statute for the application in a particular kind of case of a rule even less strict. This is true even though doing so may present an anomaly which contravenes both good order and common sense.

In the Uniform Reciprocal Enforcement of Support Act the Legislature has done just that. Perhaps it considered the good order of conformity with our sister jurisdictions to have a higher level of importance than the good order of consistency in our own laws. The Legislature said, in Code, Art. 89C, § 21:

"Laws attaching a privilege against the disclosure of communications between husband and wife are inapplicable to proceedings under this article. Husband and wife are competent witnesses and may be compelled to testify to any relevant matter, including marriage and parentage."

The competence of husband and wife to testify to any relevant matter, including parentage, is not conditioned upon prior compliance with the Lord Mansfield Rule.

We therefore hold that in cases under the Act the Maryland version of the Lord Mansfield Rule is not to be applied at all, and there is no threshold to be crossed as a precondition to receiving the testimony of any party on any relevant matter, including marriage and parentage.

The trial court found no facts, and based its dismissal of the petition on what it felt were almost insurmountable problems in the production of the evidence that would be required to enable the court to tackle the fact finding process.

We cannot agree that the problems are almost insurmountable. The same problems are peculiarly inherent in the very Act which the court was called upon to enforce. The Legislature contemplated that the petition and its supporting papers would constitute a prima facie showing, and perhaps recognized that in many cases only the enforcement machinery of the responding state would be required. It also recognized, however, that defenses may be raised, and for such cases it enacted Art. 89C, § 20, which provides:

> "If the obligee is absent from the responding state and the obligor presents evidence which constitutes a defense, the court shall continue the case for further hearing and the submission of evidence by both parties."

Whether Altemus had presented admissible evidence constituting a defense was still unresolved, in the minds of the judge and counsel, at the end of the hearing of 28 April, and the question was never resolved by the trial court. We have resolved it here.

In any case in which the distance makes infeasible the attendance in court of the petitioner or of any witness whose testimony she needs to support her claim or to meet a defense, that evidence may be supplied only by desposition. The same problems exist whether the distance be 100 miles

or 10,000 miles. The only difference is a few days in the mails and possibly a few pennies in postage expense.

In filing the interrogatories which he filed, the Assistant State's Attorney was starting down the wrong track. Interrogatories, authorized by Maryland Rule 417, may be propounded by a party only to an adverse party.

The method of obtaining evidence for use in court when the witness, whether or not a party, is not within the State and will not or cannot voluntarily appear, is by desposition. Maryland Rule 401 provides in part:

> " * * * any party to an action may, without leave of court, cause the testimony of any person, whether a party or not, to be taken by deposition for the purpose of discovery or for use as evidence in the action or for both purposes. The questions upon such deposition may be propounded orally or in writing."

The procedure is governed by Rules 403 to 415, inclusive. Rule 401 c. This case may well be suited to the taking of depositions upon written questions under Rule 405 b. Such written questions are not to be confused with interrogatories under Rule 417.

We must reverse the order of the circuit court dismissing the petition, and remand the case for further proceedings. Those further proceedings should be conducted in the circuit court, sitting in equity in the exercise of its original jurisdiction, and not as a de novo appeal from the juvenile court.

*Order dismissing petition reversed.*

*Case remanded for further proceedings.*

*Appellee to pay costs.*